## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RICHARD R. MORGAN,<br><br>                                    Plaintiff,<br><br>v.<br><br>PROVIDENT LIFE AND ACCIDENT<br>INSURANCE COMPANY, a foreign<br>corporation,<br><br>                                    Defendant. | Case No:  5:20-cv-180 D<br><br><br><br>***JURY TRIAL DEMANDED***<br>***ATTORNEY LIEN CLAIMED*** |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, Robert R. Morgan, and for his causes of action against the Defendant, Provident Life and Accident Insurance Company, alleges and states:

1.      Plaintiff, Robert R. Morgan, is a resident and citizen of the State of Oklahoma and currently resides in Edmond, Oklahoma.

2.      Provident Life and Accident Insurance Company, hereafter referred to as "UNUM," is a foreign corporation with its principal place of business in Chattanooga, Tennessee and can be served through its registered service agent Corporation Service Company at the following address 2908 Poston Avenue, Nashville, Tennessee, 37203-1315.

3.      At all times material hereto, Plaintiff was insured under a disability insurance policy which was issued by UNUM.

4.      Dr. Morgan's disability insurance policy number 52-00785976 involved in this case was issued, delivered, and renewed in the State of Oklahoma.  The disability

policy was issued July 7, 1987 and amended May 17, 2001, and again on October 23, 2001.

## BREACH OF CONTRACT AND BAD FAITH

Plaintiff incorporates into this cause of action paragraphs 1 through 4 of the Second Amended Complaint above.

5.     Oklahoma's Supreme Court has stated that a party who seeks to recover for an insured loss *has but a single cause of action*, although its claim may be advanced concurrently on *ex contractu* and *ex delicto* theories (Emphasis in original).  *Taylor v. State Farm Fire and Cas. Co.*, 1999 OK 44, 981 P.2d 1253 (Okla. 1999).  At the present time, Dr. Morgan advances his claim to recover for an insured disability loss concurrently on both contract and bad faith theories.

6.     Dr. Morgan suffered a myocardial infarction on or about March 17, 2019 which caused Dr. Morgan to be unable to perform the substantial and material duties of his occupation as an emergency room physician.  Dr. Morgan is totally disabled from his specialty as an E.R. physician from March 17, 2019 to the present.

7.     This UNUM disability product is marketed to physicians to provide coverage for their occupation in a recognized specialty.  For over thirty (30) years, Dr. Morgan worked as an E.R. physician, since July of 1987, and also worked in a day position as a clinic physician.  He had other group coverages through his employers, but always maintained and increased this disability coverage specifically to cover his duties in his specialty as an E.R. physician.

8.      Following his heart attack and subsequent treatment, Dr. Morgan's cardiologist prescribed that Dr. Morgan was unable to continue his E.R. practice due to the stress and physical demands involved with that practice and determining that his impaired cardiac condition and the increased risks and dangers associated with his current health condition precluded him from performing the principal duties of this E.R. practice. Dr. Morgan's cardiologist determined that these health restrictions would exist for his lifetime.

9.      As a result of his disability from his occupation as an E.R. physician, Dr. Morgan has been unable to return to work as an E.R. physician since March 17, 2019 to the present and his total disability from that specialty occupation will continue for the rest of his life.  Dr. Morgan has suffered and will continue to suffer total loss of his income as an E.R. physician, entitling him to the Residual Disability benefits of the policy.

10.     On November 21, 2019, UNUM determined and acknowledged that Dr. Morgan was unable to perform the material and substantial duties of his occupation as an Emergency Physician due to his medical condition of old myocardial infarction and ischemic cardiomyopathy.  UNUM's approval of Dr. Morgan's residual disability policy benefits acknowledged his cardiologist's health restrictions in limiting the stress involved in Dr. Morgan's E.R. practice and that the cardiologist had provided these restrictions and limitations for lifetime.  Based upon its determination that Dr. Morgan was disabled from his E.R. practice, UNUM commenced payment of the policy's monthly residual disability benefits, after the Elimination Period.

11.     Just two months later, on January 24, 2020, UNUM reversed its own determination and refused to provide Dr. Morgan any further coverage under his disability policy.  This continuing denial of any disability benefits for Dr. Morgan continues every month into the future for his lifetime.

12.     In its handling of Dr. Morgan's claim, UNUM acknowledged and admitted that Dr. Morgan was residually disabled as required by the terms of this policy and that he could not perform the duties of his ER practice as described by his physician during a period of time from April 13, 2019 through October 21, 2019.  On November 21, 2019, the residual benefits were paid for the period of October 1, 2019 through October 12, 2019.  Then, on January 6, 2020, the Defendant paid the residual disability benefits for a period from October 13, 2019 through October 21, 2019.  The denial letter stated that UNUM had determined that Dr. Morgan was able to perform the duties of his occupation and his restrictions and limitations were not supported after October 21, 2019.

13.     In addition to the denied residual disability benefits, UNUM has refused to honor and provide the associated waiver of premium benefit of the policy which should have been provided in connection with his disability payments.  Further, UNUM's original determination calculated benefits commencing April 13, 2019, when the benefits should have been provided from March 17, 2019.  Dr. Morgan further disputes the calculation of his residual disability benefit amount.

14.     Dr. Morgan submitted a claim under the disability insurance policy with UNUM and, otherwise complied with all conditions precedent to recover under the policy.

15.     UNUM breached the insurance contract by failing and refusing to properly and promptly pay covered policy benefits to Plaintiff.

16.     In connection with Dr. Morgan's claim, UNUM knew that Dr. Morgan had not simply voluntarily discontinued his long-time career as an ER physician on March 17, 2019, but rather that it was the direct result of a myocardial infarction which disabled him from continuing in this second job.  This anterior myocardial infarction is the type of heart attack commonly referred to as a "widow-maker".  UNUM was repeatedly confronted with evidence that his initial troponin levels following his heart attack that day would indicate a significant amount of cardiac muscle loss had occurred and that his ejection factors documented a loss of 30% of his heart function.  UNUM was aware that Dr. Morgan had been working in excess of 70 hours a week for over thirty (30) years and that the physical and stressful demands of the ER environment as a second job was prohibited for Dr. Morgan as a result of his heart attack that day and documented compromised heart function.  UNUM initially acknowledged and determined his disability from his ER work specifically citing to the specific medical findings and medical records and restrictions and limitations of Dr. Morgan's cardiologist that prevented him from continuing in his duties as an ER physician.  After seven (7) months, UNUM began its review to advance a denial of his disability benefits with an internal medical doctor that was not even a cardiologist.  The medical review was initiated only to deny ERISA benefits under an ERISA policy.  UNUM knew he was entitled to these policy benefits and that they could not appropriately deny them.  UNUM did nothing to investigate, consider or properly evaluate the stress involved with his ER duties, despite a

specific recommendation that they do so from their own reviewing cardiologist. Most of the medical opinions they procured simply addressed medical proof that was missing, no effort was made to properly investigate and make further conclusions and, on information and belief, neither of the reviewing physicians for denial were even presented with the proper policy language involved for consideration of this denial – nor did they make any determinations or medical opinions addressing the pertinent policy language. Further factual evidence, known at this time, pertinent to UNUM's failure to fully investigate Dr. Morgan's claim and properly evaluate his entitlement to benefits under the policy are set forth in the following paragraphs.

17.    Dr. Morgan had worked as an ER physician and carried his disability insurance for the same with UNUM for over thirty (30) years. For the first twenty-eight (28) years, he was an independent contractor in the ER, paid his own taxes and was the only person providing any disability insurance coverage covering his duties as an ER physician. It was just in the last three (3) years of his ER career that he worked for a company that took taxes out of his check and he was actually unaware during that time that the company also had a disability policy covering his work as an ER physician. That ERISA disability policy was also through UNUM. On information and belief, that ERISA UNUM policy was the principal factor leading to the denial of this disability claim. On information and belief, UNUM personnel knew that under the current law they could get away with denying all of his total disability benefits under the ERISA policy and made an intentional decision that they would need to deny benefits under this individual policy, as well, in order to be consistent in their position on Dr. Morgan's

disability.  In truth, UNUM was always well aware that Dr. Morgan qualified for the disability benefits of this policy and denied these benefits knowing he was entitled to them.

18.    UNUM's reversal of its own determination of his disability from his ER practice on January 24, 2020, was by a denial letter that addressed the claim number and policy number for Dr. Morgan's group ERISA disability policy, as well as the policy number and claim number under the involved policy, combining their new decision for denial of benefits under both policies in one denial letter.  On information and belief, UNUM would always consider and pay or deny separate claims under separate policies separately, but for an intentional ploy devised to conceal the improper nature of this denial.  The ERISA disability policy would have owed benefits on the basis of total disability with payable benefits several times that involved in the benefits payable under this individual policy.  Of course, in order to deny these much larger total disability benefits under the ERISA policy, UNUM was aware and intentionally determined that they must also change their position and deny that Dr. Morgan was disabled under the involved individual disability policy.

19.    This combined January 24, 2020 denial letter, as required by law, is supposed to set forth in writing the exact basis and policy provisions that serve as the basis for the denial.  The section in the denial letter entitled "**Decisions/Reason**" states: "We have determined you are able to perform the duties of your occupation and your restrictions and limitations are not supported after October 21, 2019".  The paragraphs states that for that reason, Dr. Morgan is not disabled according to the Long-Term

Disability (the ERISA policy) **and** Individual Disability policies.  Then, the combined denial letter has a section entitled "**Policy Provisions From Your Long-Term Disability Policy**".  Then, the denial letter cites only a UNUM disability policy provision that, on information and belief, is the disability provision from UNUM's ERISA policy. This is the only policy provision quoted as the basis for UNUM's denial stating what disability means and that policy provision is not contained in this individual disability policy at all – not as the definition for Total Disability, nor for the Residual Disability benefits for which they were now going to begin denying coverage.  The denial letter specifically states that UNUM relied upon this policy provision in making its decision to refuse the benefits when the policy provision is much different from and not contained at all in the involved individual disability policy.  UNUM intentionally made the decision to refuse the benefits of the individual disability policy simply based upon the fact that they wanted to deny coverage under the ERISA policy based upon the provisions of that policy and they knew they were forced to be consistent in their position with regard to the fact of Dr. Morgan's disability from ER work.  UNUM did not fully investigate, properly evaluate or even consider any provisions of the involved policy or whether or not Dr. Morgan qualified under its provisions for residual disability payments at all.   On information and belief, in its investigation and handling of Dr. Morgan's claim, UNUM never showed the pertinent residual disability provisions or wording to anyone involved in considering or rendering medical opinions regarding whether or not Dr. Morgan would qualify for the same.   No one has ever even considered, much less determined and

opined, that Dr. Morgan was not entitled to his benefits under the proper, pertinent policy provisions.

20.    The denial letter makes specific reference to policy provisions for the involved individual disability insurance policy and states that they relied upon the policy when making their decision, including the provisions listed below.  However, the only policy provisions that are then listed below are policy provisions regarding appeal of the denial.  The Defendant's denial letter intentionally did not set forth any other provisions of the involved policy.  There is only a general reference to please refer to the following provisions and definitions:  followed by a listing of six (6) different policy provisions. UNUM intentionally, omitted any recitation of the policy provision that says what residual disability means.  Instead, it simply buried a reference to that provision and then stated that its decision was based upon other policy provisions to hide the truth from its insured.  The denial letter only sets forth one explanation and definition of what disability means and it is very different from the definition pertinent to this claim.

21.    The pertinent residual disability provisions of the policy that UNUM had initially acknowledged and determined coverage under, prior to its realization that it could not pay under this policy while going forward with its ERISA denial, states the following:

> Residual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:
>
> 1.     you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;

2.      you have a Loss of Monthly Income in your occupation of at least 20% and

3.      you are receiving care by a Physician which is appropriate for the condition causing the disability.

After the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time.  Residual Disability or residually disabled then means that due to Injuries or Sickness:

1.      you have a Loss of Monthly Income in your occupation of at least 20%; and

2.      you are receiving care by a Physician which is appropriate for the condition causing the disability.

The involved policy, policy number 6-335-785976, is attached as Ex. 1.  The Defendant's denial letter dated January 24, 2020 is attached as Ex. 2.

22.      No one, including UNUM's "review" cardiologist, ever opined that Dr. Morgan, during the elimination period, (180 days) was not unable to do at least one of his substantial and material daily business duties, much less that he was able to do his usual daily business duties for the same length of time during that period.  Indeed, UNUM, in writing, had determined that he did meet this policy definition for payment of the residual disability benefits through the entire elimination period (180 days) such that they eventually had already started making payments of the residual disability benefits for some time following the satisfaction of the elimination period.  UNUM knew by January of 2020 that they could not possibly deny the policy benefits for residual disability under this policy under the applicable policy provision and so they intentionally misdirected  in their denial letter  which policy provision was pertinent.  By their own written documentation of their own claims determinations for Dr. Morgan, they could not

contend that he did not meet the definition "during the Elimination Period" (180 days) and so his entitlement to benefits was under the second half of the definition for Residual Disability.  After the Elimination Period has been satisfied, you only have to show a loss of monthly income of at least 20% and that you are receiving care by a physician appropriate for the condition and there was never any question that he met these two (2) requirements.  Since it was after the Elimination Period, it no longer even mattered whether or not Dr. Morgan was able to do the duties of his ER practice.  That condition no longer applied.    The denial letter itself recites that his ER income was about 50% of his income.  UNUM knew that Dr. Morgan was entitled to continue receiving his residual disability benefits under the applicable policy provision, but made a decision to misrepresent the truth in their denial, because they feared that their earlier determination of Dr. Morgan's disability from his ER practice in connection with this individual policy might create an argument for arbitrary and capricious denial of the ERISA claim. Although you would normally always have separate denial letters for different claims under different policies, UNUM intentionally determined that they could best mislead and conceal the truth from their insured by combining these two denial letters.  UNUM knew that they could not discontinue Dr. Morgan's residual disability payments under the two criteria that remained, no matter what they paid some review physician to opine. Instead, this scheme for a deceptive combined denial was devised in order to facilitate their plan for denial of the ERISA policy benefits and eliminate inconsistent positions on the doctor's disability, while concealing the true factors involved in triggering eligibility for this residual benefit.

23.     Before UNUM had decided upon this plan for a deceptive combined denial, they were well aware that they could discontinue payment of these payable residual benefits only on the basis of the remaining two (2) criteria and they knew that Dr. Morgan was receiving appropriate care for his condition.  Therefore,  they decided to challenge whether or not his loss of income was at least 20%.  UNUM knew that his actual loss of income was approximately 50% of his total income, but this was the only factor remaining that they could try to challenge.  For that reason, Mr. Hill began to contend that Dr. Morgan's income was only reduced 20% for certain months and threatened to deny his benefits on that basis.   They contended that their intentional miscalculations were the fault of Dr. Morgan's failure to provide them all the information that they needed.  Of course, this was untrue.  The denial letter itself states that Dr. Morgan only brings in about 50% of his income after his disability led to him working only one of his two jobs.  In fact, UNUM was able to calculate the benefits on the information that had been provided. Dr. Morgan wrote UNUM describing his complete inability to get any response from Mr. Hill at all, the fact that Mr. Hill was refusing to call him or communicate with him resulting in months and months of delay and complete inability to communicate with UNUM's disability benefits specialists to try and determine how such a false contention could exist.  Dr. Morgan's communications claim that he was talking about a disability that occurred 10 months and 13 days ago, that his premiums were supposed to have been suspended once the disability occurred and that he simply could not get any meaningful response as to why UNUM would be claiming he did not meet at least the minimum 20% loss of income.  This bad faith handling and other

calculations in the few months that were paid were unreasonably low offers of settlement and delay and conduct planned to support a denial of the residual disability benefits altogether, until the decision was made to simply utilize the deceptive combined insurance denial.

24.     Provident's outline of coverage for the policy specifically states Residual Disability Benefits pay a percentage of the Total Disability Monthly Benefit when, due to injuries or sickness, you suffer a loss of earnings of 20% or more, and you are receiving care by a physician.  (During the Elimination Period only, you must not be able to work fully because of your Injuries or Sickness).   UNUM's personnel have a very good understanding that the residual disability benefits are based only on a loss of income, except during the Elimination Period, and that during the Elimination Period the injury or sickness only has to interfere with your ability to work **fully**.  The claims representatives involved in the denial of Dr. Morgan's claim are well aware of these limited triggers and well aware that Dr. Morgan had a loss of income as a result of his heart attack and heart condition during the Elimination Period.  The manner in which they combined this denial with the ERISA denial and conspicuously omitted these relevant factors was intentional, deceitful, and without any justifiable basis.

25.     Many years ago, the Oklahoma Supreme Court indicated that if there was any inference of unreasonableness in the insurance companies denial, then the reasonableness of the insurer's conduct was always a question of fact for the jury. *McCorkle v. Great Atlantic Ins. Co.,* 1981 OK 128, 637 P.2d 583 (Okla. 1981).  In its more current review and dissertation as to the status of bad faith law in the State of

Oklahoma, the Oklahoma Supreme Court again recites the *McCorkle* principal that, if any such differences can be inferred from the facts, then the reasonableness of the insurer's conduct should always be left for the jury to decide, citing its previous law from *McCorkle*. *Badillo v. Mid Century Ins. Co.,* 2005 OK 48, 121 P.3d 1080 (Okla. 2005). Unfortunately, predominately in Oklahoma's federal courts, Courts have begun to weigh the reasonableness of the insurer's conduct and are commonly taking that issue away from the jury "as a matter of law", contrary to the laws established by Oklahoma's Supreme Court. As a result, UNUM is well aware that they might convince a Court that, since they paid a few hundred dollars for a cardiologist review at some point, that they cannot be accountable under Oklahoma's bad faith law. UNUM's knowledge of this fact guided its attempt at this improper denial. If someone was not able to see through the improper information provided in the denial letter, where they could not satisfy the Court sufficiently to pursue a bad faith action, then their insured might not even have access to the documentation as to what really happened in the handling of their insurance claim. UNUM intentionally calculated that, in federal court, their exposure might simply be what they owed in the first place, even if they were caught in the conspicuously improper conduct that occurred. It was UNUM's knowledge and recognition of the lack of accountability in our justice system that caused them to risk such a conspicuously improper denial. For these reasons, UNUM's policy is to risk such improper denials, knowing that in many instances their exposure may be limited to what they owed in the first place anyway, that they will not be held accountable properly for their actions, and that scorched earth litigation tactics can result in beating their insured down to a point

that in most cases, they won't even have to pay what they owed in the first place.  Dr. Morgan was intentionally victimized by this knowledge of UNUM and UNUM's conduct in this case to profit from the same.  Under Oklahoma law, Dr. Morgan should be allowed to try and hold UNUM fully accountable for their conduct in the denial of this claim.

26.    Around the 1990's, federal courts interpreting ERISA law developed an extreme deference to insurance companies in making medical determinations for policy benefits.  UNUM states that we will make the determination as to whether or not you are disabled.  Essentially, the finest doctors in the country, along with an insured's treating physicians, can unanimously vouch for the efficacy of a treatment, but if an ERISA insurance carrier can get one doctor to sign off on any kind of medical review, then they can refuse policy benefits in such medical determinations.  Under the law developed by the federal courts, the insured's legal remedies are essentially non-existent such that 90%+ of all such ERISA denials are affirmed and people cannot even get any lawyers to represent them on conspicuously improper medical determinations for denial of ERISA policy benefits.  UNUM knows these facts and intentionally applied these facts in Dr. Morgan's case, leading to this denial of the individual benefits.  UNUM is perhaps the largest profiteer in the country of this unfortunate develop in the law, such that they have been the subject of multiple lawsuits and media news reports as a result of whistle-blower medical reviewers describing the vagaries of UNUM's misconduct in abusing such medical reviews.   UNUM/Provident has the great majority of all disability products in the country.  Federal Courts have repeatedly denounced the injustice associated with this

ERISA law and acknowledged that it has led to insurance companies literally killing people and blatantly cheating them out of their policy benefits. These Justices can only remark that the law has been that way for a long time and that it is something for Congress to change at this point. These federal judges understand the abuses, the human tragedy, and the plain injustice and abuses of this ERISA law but are confined now by the fact that it has remained the law for such a long period of time. See, for example: *Haynes v. Prudential Health Care*, 313 F.3d 330, (5th Cir. 2002); *Cannon v. Group Health Services of OK, Inc.,* 77 F.3d 1270 (10th Cir. 1996); *Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir. 1998); *Andrews-Clarke v. Travelers Ins. Co.*, 984 F.Supp 49 (D. Mass., 1997). UNUM/Provident, now dominating America's disability insurance market, was perhaps the leader, and certainly one of the leaders, in developing a cottage industry of medical reviewers to supply them the letters they need to support their denials. Under the law of ERISA, UNUM is accustomed to ignoring all reasonable factual evidence and circumstances of disability and knowing that they can get away with a denial anytime there is several hundred dollars spent that provides them one medical opinion to support the denial. This abuse occurred in connection with the handling of Dr. Morgan's ERISA claim such that he will probably never get any benefit from his ERISA disability policy which provided the largest total disability benefit that he should have received upon his disability from his ER practice. It was UNUM's knowledge that it could get away with any review letter, no matter how insufficient, that led to them procuring and then asserting this insufficient evidence to deny Dr. Morgan's claim under this individual policy as well. UNUM knows that it has less than a 10% chance of ever having to honor

that ERISA disability policy simply because they obtained a medical review that somewhat, on some points, supports their action for denial. In less than 10% of the cases, UNUM knows that their exposure would be limited to what they owed in the first place. Now, UNUM attempts to proffer the same letter they procured in the ERISA claim as some kind of a legitimate excuse, again with the knowledge and expectation that in a significant number of the cases the federal court might limit their exposure to what they owed in the first place on this individual policy. Only this lack of accountability in our judicial system, and UNUM's knowledge of the same, is responsible for UNUM management attempting the known improper denial attempted in this scheme of using a combined denial letter. Only this lack of accountability would cause an insurance company to hide from its insured the applicable policy provision because they knew that they could not discontinue his residual disability benefits under the pertinent policy provision. These facts are not collateral, but on information and belief, are the sole dynamics that caused UMUM to deny this individual disability claim. UNUM's knowledge that their prior determination that Dr. Morgan was in fact disabled from his ER work and that this could serve to undermine their almost bulletproof ability to capriciously deny ERISA benefits is the root cause of why such a denial would occur. UNUM did not care whether they fully and fairly investigated this claim, nor whether they properly evaluated it. In fact, they already knew they could not properly deny it. Instead, their actions were motivated only by their desire to still take advantage of the applicable ERISA law and the lack of accountability and the efficacy of unreasonable denials under that law together with their limited risk on the individual policy. Plaintiff

specifically alleges that UNUM would not have taken such action but for these facts. Almost two (2) years later, Dr. Morgan has not even been able to proceed under Oklahoma's bad faith law and UNUM's risk calculations may have been very well founded, even though the denial letter was unsuccessful in concealing the coverage for the claim.

27.     UNUM knew that Dr. Morgan had far more than 20% loss of income due to his disability from his ER practice, that as a doctor he would be receiving his proper cardiac care, and that they unquestionably would continue to be obligated for continuing residual disability benefits under this policy. But, UNUM did not want for Dr. Morgan to be able to claim an arbitrary and capricious determination under his ERISA policy based upon the determination they had already made under the individual policy that he was disabled from his ER practice. Therefore, UNUM set out to take advantage of its ERISA review doctors knowing that it didn't matter whether or not they conducted a full and fair investigation, whether or not the doctors' even opined on the real issues of disability and whether or not they even showed the doctors the applicable policy provisions. Instead, they made a decision to get their normal review that would suffice to deny claims under the ERISA policy and decided to tie this policy's benefits to the same denial in order to hide the differences in eligibility under the two (2) policies. Although UNUM knew the doctor's review was unreasonable, they also knew that it would be sufficient for their ERISA denial and that there was a very significant chance they could submit it as a legitimate excuse on the individual disability claim and limit their exposure there to what they owed in the first place.

28.     Additionally, through excessive briefing, protracted litigation, waiting until the summary judgment decision to see if the legitimate excuse works and other scorched earth litigation practices UNUM calculated that they could probably force a resolution for less than what they owed in the first place on the individual claim.  Due to these dynamics and UNUM's knowledge of the same, the majority of trial lawyers, including those that extensively represent Plaintiffs in bad faith cases, will not handle such a case in federal court – not even with the standard 50% contingency on bad faith cases.  On information and belief, when UNUM makes an intentional decision to improperly deny such benefits, with a documented denial letter that conspicuously conceals the true pertinent policy provision, it takes that risk only based upon its knowledge of these facts. Dr. Morgan asserts that his denial would not have occurred but for UNUM's intentional decision that it was well worth this mitigated risk and that punitive damages are appropriate in this case in order to deter such denial conduct.

29.     In appealing his denial, Dr. Morgan has stated that the only one way UNUM could have all of these details go away, was to have a non-ER physician decide he could go back to work despite the stress of the job (which he was not qualified to address by his own admission) even though studies and common sense show that stress increases your risk of a repeat heart attack and his heart attack first happened under that stress while he was working in the ER.

30.     Dr. Morgan wrote UNUM's doctor, Joseph Antaki, and told him:  You are possibly aware that UNUM is doing everything possible not to pay my benefits which I paid about $100,000 over thirty-two (32) years.  They stated my earnings, so they could

deny me payments after the initial six-month waiting period.  UNUM informed me it was less than 20%, but it was over 33% despite having every financial record I have, having asked for several things twice.  They are behind two (2) months in paying me to date. After eight (8) months, they have hired you to state you don't see a reason I can't go back to my previous schedules in the ER.  Dr. Morgan's recitations reference the attempt to argue the 20% income loss  prior to UNUM deciding upon simply denying his claim without quoting the pertinent policy provisions.  These efforts at denial resulted in unreasonable delays in the payment of policy benefits, intentional miscalculation of the applicable policy benefits and unreasonably low offers of settlement, all supporting Dr. Morgan's bad faith claims.

31.     Dr. Morgan told UNUM's Dr. Antaki that on the advice of his cardiologist he stopped working in the ER.  UNUM already knew this to be a fact from the medical records, from Dr. Morgan's cardiologist and from the undisputed evidence in connection with this disability claim.  Dr. Morgan told Dr. Antaki that there was no way he could go back to the amount of work (the hours) and the stress and physical activity that he had prior to his anterior myocardial infarction.  UNUM never addressed the amount of hours or that reduced time alone could qualify for disability.  He explained that the loss of pump function impairs his ability to work as he had for over thirty (30) years, not the lack of ischemic changes on my last treadmill test.  He asked Dr. Antaki "Would you exercise to the point of ischemia on an exercise stress test after a major heart attack or would you ask that of one of your patients?"  UNUM never investigated or responded to these questions in any fashion.  No one ever suggested that Dr. Morgan would be forced to go

ahead and conduct a stress test up to the point that would demonstrate ischemia, nor did any doctor or any UNUM representative ever indicate that that would be a good idea for Dr. Morgan.  Instead, UNUM's cardiologist simply stated that his stress test did not demonstrate ischemia because he stopped short.  The medical records and all of the claim information was unequivocal that Dr. Morgan had voluntarily ceased the stress test and did not push it to a point where ischemia would have been indicated.  In fact, UNUM's cardiologist noted that the stress test was "self-limited" and noted that it was useless for that reason, because it could not possibly have ruled out ischemia since it was not conducted to the point that would cause ischemia.  So, it showed nothing of relevance. Nevertheless, UNUM seized only on the point that no ischemia was demonstrated and ignored all the other relevant information.  The policy does not require a person to stress test until they have ischemia, nor to continue work until they have another heart attack, nor to meet any further medical conditions for the continuance of Dr. Morgan's residual disability payments.  The entire appeal process was very subjective, aimed only at denial, citing only facts against Dr. Morgan, but, in fact, was only diversionary because there was no medical condition left for him to satisfy after the conclusion of his elimination period.  UNUM had already determined and still is of the position that he qualified medically until after his elimination period, specifically until October 19, 2019.  The entire medical dispute was an irrelevant diversion.

32.     Dr. Morgan told UNUM's Dr. Antaki that he had worked at least 70 hours per week since he was 27 years old and was now 60.  He had not slowed down, nor had he backed away from any ER shift and was scheduled to work the following months after

his heart attack.  He noted that Dr. Antaki had pointed out that he had gone back to work in his office practice only five (5) days after his heart attack.  He advised Dr. Antaki that it was his nature to work and his office is primarily a wellness program in a work comp clinic and is low stress.  He was told to take off two (2) weeks but opted against it and went back to work.  He simply was unable to continue to work the long hours and the stressful and physical demands of the ER.  He also advised the doctor that he had been averaging two-to-three miles of walking a day and that he was limited by fatigue and he got exertional chest pain that stops when he rests.  He indicated that he carried nitro and had taken about ten (10) of them in the last four (4) months for exertional chest pain.  He advised Dr. Antaki that he had not reached out to Dr. Morgan, nor to Dr. Morgan's cardiologist and asked him whether he cared if he reached his doctor for his doctor's opinion.  He described difficulties with trying to arrange phone calls with the doctor and being provided the wrong telephone number, etc.  He told Dr. Antaki that he had an acute anterior myocardial infarction with initial troponin level of 10 which was very high and would have caused significant amount of cardiac muscle loss to have occurred.  He stated that after two stents were placed, he had an ejection fraction of 40% (loss of 30% of my heart function).  He talked about his compromised heart function and the stamina, energy level and ability to multitask in a crowded ER with constant trauma, drama and patient interaction and charting requirements and that his abilities to perform those in a night shift were severely and irreversibly impaired.  He stated again that there were not any ischemic changes on the ETT because he stopped before that could have occurred.  All of

this information had basically already been provided to UNUM prior to their cardiologist review letter and UNUM was well aware of these many facts, but chose to ignore them.

33.     As with the ischemia, UNUM and UNUM's cardiologist simply ignored the facts and stated that Dr. Morgan must be fine because he was walking two-to-three miles a day.  The recitations ignore his associated exertional pain and the fact that walking is a low stress beneficial exercise for such heart patients that would actually be considered beneficial, in contrast to a night job as an ER physician.  When UNUM's reviewing physician did mention the notations in the medical records of exertional chest pains, it was only to indicate that his chest pains responded well to the nitroglycerine.  All comments in the review are clearly advocacy oriented towards denial and UNUM had no reasonable belief to it constituted any kind of an objective opinion.  In fact, they knew that the medical opinion would only serve as a good excuse to justify an ERISA denial and that it was irrelevant to any remaining policy conditions for the continuance of Dr. Morgan's residual disability payments.

34.     In the spring of 2020, Dr. Morgan had a nuclear stress test and it was abnormal.  He was scheduled for an angiogram immediately to see if he needed another stent.  There is no one that has opined that it had ever been a good idea for Dr. Morgan to return to his ER work or that he could safely do so.  UNUM simply garnered their standard ERISA medical review denial letter so that they could cheat Dr. Morgan out of his ERISA benefits.  UNUM would not have even been investigating whether or not he was able to do the substantial material duties of the ER in connection with his residual disability benefits because that was no longer a condition.   UNUM had already

23

determined that he met that condition throughout his elimination period and their standard ERISA medical review denial letter from the review doctor was only for the denial of ERISA benefits.  It should not have had anything to do with their consideration and eventual denial.  But, the doctor review letter was also going to be asserted as the legitimate excuse for their denial under the individual policy.

35.     Dr. Morgan has pointed out to UNUM that the denial letter says the echocardiographic findings: "do support some degree of damage to the myocardium" but the reported ejection fraction "does not always" correlate well with symptoms or degree of functional impairment.  Dr. Morgan noted that he did not see that a lack of correlation is pertinent one way or the other to his disability for performing his duties at the ER or his hours at the ER.  The fact is that he had damage to his heart and its function and that the ejection fraction was demonstratively compromised, irregardless of the correlation between the two.   Again, UNUM's denial simply makes statements that it believes support the denial without any opinions, conclusions or real determinations that have anything to do with whether or not he was qualified for the policy benefits.   On information and belief no UNUM doctor or other representative was ever presented with or ever addressed the actual criteria of being unable to perform even one material duty or not being able to perform it for the same amount of time.  The relevant standard, that applied only during the elimination period, was completely ignored and never addressed in any fashion by UNUM in its handling of the claim.

36.     In its appeal of the UNUM denial, Dr. Morgan further argued the statement in the denial that left ventricular function "can evolve over time" with both positive and

negative remodeling that may occur.  He argued that this statement indicated that his disability might improve – or worsen – over time.  The statement was wholly irrelevant to any medical determination because there was absolutely no medical evidence that his left ventricular function had worsened.  In fact, later testing confirmed that it had worsened. UNUM makes this statement in support of their denial while being completely unable to claim that there was any evidence that Dr. Morgan's had improved or worsened. Certainly, the previous medical records had said nothing about an exertional angina and now, it was being reported as a regular occurrence.  UNUM's denial simply remarks that the only source of this information is Dr. Morgan as if to infer and accuse him of lying about his exertional pain to his own doctor that prescribed his nitroglycerin.  On appeal of the denial Dr. Morgan pointed out to UNUM that the patient is always the only source of information with regard to exertional chest pain.  No one else can feel it.  When people discontinue activity and take nitroglycerin and report it to their cardiologist for appropriate cardiac care, it is generally considered reliable under the applicable law. The remarks of UNUM in their cardiologist review letter and their denial letter, again, evidence only their attitude towards denial, rather than objective consideration.  A jury might find that such repeated biased remarks aimed only at denial reflected unreasonable consideration, rather than any legitimate excuse.

37.    On appeal Dr. Morgan pointed out that he discontinued the stress test secondary to shortness of breath and fatigue, which is what "self-limiting" means.  That in and of itself is of concern.  The stress test was conducted, witnessed, and supervised by

professionals and Dr. Morgan made these arguments to UNUM, all of which were perfunctorily ignored.

38.    Dr. Morgan's cardiologist, Dr. Collazo also wrote UNUM's doctor, Dr. Antaki, and advised that he had reviewed his records and notes on Dr. Morgan again.  He stressed that he had told Dr. Morgan to discontinue his ER practice due to the stress involved with that type of practice but that he could continue with his office practice. The cardiologist did not understand how anyone could disagree with that assessment under these circumstances.  UNUM's predetermination for denial was actually based only on the fear that their ability to refuse his ERISA benefits might be compromised.  They ignored all evidence supporting Dr. Morgan's disability intentionally because they knew they did not have to fairly consider it in order to deny his ERISA benefits.  They only realized that they were forced to also discontinue his residual disability benefits because a determination that he was disabled from his ER work under one policy would be inconsistent with a determination for denial under the ERISA policy and provide an argument for an arbitrary and capricious denial.

39.    The medical reviews that UNUM obtained as an excuse for this denial actually included statements from the medical reviewers that there had never been any behavioral or occupational analysis or examination that considered the additional stress associated with the occupational duties of the ER.  The cardiologist upon which UNUM relied indicated that he was not fully evaluating the stress involved and basically recommending that a proper and full investigation of the matter would require a different specialist.  UNUM did not further investigate and consider the stress and occupational

hazards associated with an ER practice and did not properly investigate with a specialist in connection with the same.  They simply asserted these reviews for denial.  Both Dr. Morgan and his cardiologist had discussed this stress as an integral part of the claim and it was inadequate investigation for UNUM to ignore the same, especially after their own reviewer had indicated it was necessary.

      40.    Only discovery while pursuing his claim for loss under a theory of bad faith will allow Dr. Morgan full access to all of the documentation, testimony and evidence relevant to the details in the and handling of his insurance claim.  Unless and until he is allowed to proceed under such a theory of recovery in connection with his insurance claim will he be able to discover and know more detail as to what may have occurred. On information and belief, the documentation of the handling of Dr. Morgan's claim and the testimonial evidence of the persons that handled his claim, all solely within the possession of his insurance company, will substantiate the allegations set forth above and reveal other evidence of bad faith.

      41.    All of the above paragraphs raise a reasonable inference that should be determined by a jury as to the reasonableness of UNUM's conduct in the denial of Dr. Morgan's claim under Oklahoma law, following their proper instruction of the law under the instructions that were developed by Oklahoma's Supreme Court for the jury's consideration of the same.  UNUM's consideration of Dr. Morgan's claim was not adequately, or even properly, investigated, it was improperly evaluated as a matter of law, and Dr. Morgan prays this Court allow him to proceed on his claim for loss of these policy benefits under both a theory of recovery based in contract and based in bad faith.

42.     As a direct result of UNUM's breach of contract and breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered the loss of policy benefits, physical and emotional distress, and other consequential damages.

43.     UNUM's acts and omissions in breach of the implied covenant of good faith and fair dealing were grossly reckless and/or done intentionally and with malice, and therefore, Plaintiff is entitled to recover punitive damages.

WHEREFORE, Plaintiff prays for judgment against the Defendant, Provident Life and Accident Insurance Company, in an amount in excess of the jurisdictional amount set out in 28 U.S.C A. §1332 with interest and costs of this action, for a reasonable attorney fee, and for such other relief as may be appropriate.

## FALSE REPRESENTATION, CONCEALMENT AND DECEIT

Plaintiff incorporates the above paragraphs of this First Amended Complaint paragraphs 1 through 43 and further alleges and states:

44.      In 1987 and since that time, UNUM and Dr. Morgan knew that physicians would normally be provided group disability insurance through their employers in most regular physician occupations.  UNUM knew that this was the most common objection that UNUM's agents would encounter when attempting to solicit and sell this individual disability insurance product.

45.     In 1987 and since that time, UNUM and Dr. Morgan knew that emergency room specialists worked as contract laborers, would not typically be provided any group disability insurance in connection with their E.R. work and needed this individual disability policy to protect their income loss as an E.R. physician should they become

disabled from performing this stressful, physically demanding, specialized work. UNUM's agents were trained to overcome sales objections that might involve E.R. specialty work by stressing that their policy was specifically designed to provide its total disability benefit if you could no longer do this type of specialty work, but continued as a physician in other work.

46.     In 1987 and since that time, UNUM and Dr. Morgan were aware that performing the duties of an E.R. physician involved very stressful and specialized work that a physician, due to health, might be unable to perform, even if they were still able to continue in their occupation as a physician.

47.     UNUM trained their agents, and otherwise marketed this disability product, emphasizing this feature of the policy to overcome such common sales objections while intentionally omitting any reference to the fact that this feature would not provide the total disability benefits of the policy if the physician was already engaged in two separate occupations at the time of their disability from their specialty work.

48.     In marketing and selling this individual disability policy, UNUM emphasized that it would pay the total disability benefit amount purchased on the loss of your income from your specialty work, even if you continued to receive income from other work as a physician.  UNUM knew, and intentionally omitted, the fact that this was not true and that physicians would not be entitled to the total disability benefit of the policy in the event that the physician became disabled from his occupation at a time when he was already engaged in another occupation.  UNUM knew that its representations were true only in particular factual circumstances and would not be true, but be different,

in other factual circumstances.  However, the representations of full payment of the total disability benefit on disability from your specialty were deceitfully promulgated without any reference to the specific factual circumstances, or any limitations at all, limiting the promised total disability amount.

49.     Dr. Morgan's residency was at the Oklahoma Health Sciences Center from July 1, 1986 to June 30, 1989.  He worked as an intern from July 1, 1986 to June 30, 1987.  He finished as a resident in family practice – internal medicine – working on the floor at the Health Sciences Center from July 1, 1987 to June 30, 1989.  Following his initial year as an intern, on July 1, 1987, Dr. Morgan was licensed as a physician, including a requisite narcotics license, and was able to start his job "moonlighting" as an emergency room physician.  Dr. Morgan's first day on the job as an E.R. physician was July 2, 1987 and he has continued moonlighting as an E.R. physician in the years since that time.  From the original issue date of this policy, July 7, 1987, both Dr. Morgan and UNUM knew and understood that Dr. Morgan was working two (2) jobs and that this policy should provide its total disability benefits if Dr. Morgan became disabled from his specialty duties as an ER physician.

50.     The involved individual disability insurance policy, effective July 7, 1987, provided his only disability coverage for his existing duties as an E.R. physician while he continued to work as a licensed resident physician during the day at the Health Sciences Center.  Dr. Morgan's occupation as an E.R. specialist, while at the same time in a dual capacity as a licensed internal medicine physician, existed prior to the effective date of this policy.  In Dr. Morgan's communications with UNUM in purchasing this individual

disability policy, including on June 15, 1987, Dr. Morgan specifically told UNUM of his intention to moonlight an as E.R. physician as soon as he obtained his physician license on July 1, 1987 and continuing in this specialty into the unforeseen future.

51.    The policy was marketed and specifically sold to Dr. Morgan and purchased by Dr. Morgan specifically in reliance upon the promise that the policy would provide its total disability benefit should he ever become disabled from his specialty duties as a E.R. physician, even if he continued to work as a licensed physician at the Health Sciences Center to complete his residency.  At all times in the original sale of this insurance policy and in all instances in the years that followed, Dr. Morgan paid his insurance premiums to UNUM in reliance upon this promise of the total disability benefit of the policy.  This promise was initially made and at all other times was intentionally promised, with knowledge that Dr. Morgan moonlighted and was engaged as an E.R. physician in a dual capacity with his regular occupation as a licensed physician and the promise of the total disability benefit was extended with this knowledge and without the truth that the total disability benefit would not apply in Dr. Morgan's circumstances due to his dual occupation.

52.    The factual detail and particular who, what, when, and where, associated with this cause of action is set forth in this paragraph with as much specificity as is currently known to the Plaintiff.  On or around June 15, 1987, UNUM's soliciting agent, Earl Chambers, met personally with Richard Morgan at the hospital where he was completing his intern year of residency.  The insurance company and Mr. Chambers touted this insurance policy to be better than most physician disability coverage because

it provided coverage specifically for your duties in your specialty, if you worked in a recognized medical specialty.  Mr. Chambers and Dr. Morgan discussed that Dr. Morgan was going to work "moonlighting" as an E.R. physician. On July 1, 1987, Dr. Morgan was able to moonlight in the ER and had his first ER shift on July 2, 1987.  The disability insurance companies would put on presentations similar to the pharmaceutical reps at lunch or after meetings to residents.  Both Mr. Chambers and Dr. Morgan were aware that he would be an employed physician at St. Anthony's as he had been offered a job after he spent three (3) months there in his first year of residency (actually working in the same capacity as Dr. Morgan does now).  As an employed physician, his disability insurance as well as his health and life insurance were part of the benefit packages.  Dr. Morgan told Mr. Chambers that the insurance was needed to cover his ER moonlighting job that would not be covered by disability insurance that was provided by his employer for his other work.  Dr. Morgan did not have a disability policy through the residency program and would only have disability insurance that covered his job at St. Anthony's as a clinical physician.  Mr. Chambers was selling him this insurance policy specific to his second job as an ER physician and knew that his representations were specific to his specialty as an ER physician and specific to becoming disabled from an ER physician at a time when he was working two (2) jobs, just as Dr. Morgan wound up doing for his entire career.  Mr. Chambers said that if he bought a policy for his ER specialty at this early stage of his career that he would get the best rates and automatically qualify to increase the coverage as his earnings increased.  Purchasing this coverage for his second job as an ER physician at this early stage would guarantee his ability to increase the policy amount

maximum up to a maximum. Mr. Chambers explained that many doctors may become disabled from their principal occupation in a recognized specialty, but still be able to perform some duties as an office physician.  He explained that, if Dr. Morgan was working in his recognized specialty, then UNUM would view that specialty as his occupation and he would receive the full disability benefits of the policy, even if he were able to continue working in some other duties as a physician.  At the time of issuance of this policy, and in subsequent years, Dr. Morgan was working as a family practice – internal medicine practitioner and, also, in his specialty as an E.R. physician.  This policy would, in effect, provide coverage for the loss of the extra income that would be expected from his specialty occupation, even if he continued to work as a physician in some other capacity.  This was explained as the principal benefit and special feature of this disability policy, as compared to competitor's products.  The agent explained that, as his income grew, he would be entitled to increase the monthly disability benefits and that he should increase those monthly benefits as much as he was able so that he would always have sufficient coverage in the event he became unable to work in his specialty.  In reliance upon these representations, Dr. Morgan did increase his benefits in May of 2001 and in October of 2001.  These applications for the increased coverage were written and made a part of his insurance policy and specify that the exact duties of his covered occupation was as an emergency room physician.  In reliance upon UNUM's promises, he paid premiums and maintained this disability coverage for thirty-three years in order to insure his recognized specialty as an ER physician.  Dr. Morgan also worked a second job most of those same years with a physician team doing clinical work and knew he normally had

group disability coverage through that employment for that work. Mr. Chambers had specifically told Dr. Morgan that he would be considered totally disabled for payment of the full policy benefit, if he became unable to perform the duties of his recognized specialty, even if he was actually continuing to work as a physician. UNUM and the agent made these promises without any disclosure that they would attempt to handle the claims in any other manner, if Dr. Morgan was working in multiple occupations. In fact, their representations and contract amendments were directly to the contrary. The materials that were shown to Dr. Morgan contained the same promises and information that were told to him and in all respects failed to disclose anything to the contrary. In all respects, UNUM emphasized that this disability product was specialty occupation specific, would cover him specifically for his specialty duties if he engaged in a recognized specialty and would provide the full policy benefit on any disability from his work as an emergency room physician. The principal selling distinction emphasized by UNUM in the sale of the policy is that his occupation would be considered his duties as an emergency room physician, rather than as the duties of a physician generally. Instead, UNUM considered both his duties as an E.R. physician and his duties as a clinical physician to be his occupation. At the time of the original sale of the policy and the amendments of the same, no one ever disclosed anything different with regard to multiple occupations or partial disabilities in any way. UNUM made its representations of coverage generally, knowing Dr. Morgan was going to be working two jobs, and intentionally omitted that the representation would not be true in factual circumstances such as Dr. Morgan's working two jobs. The representations of total disability benefits

were made stating simply if he continued working as a physician, without disclosing that such total disability benefit would not apply unless his other continued work as a physician did not start until sometime after the time of his disability.  In fact, the words continue and continued, in the context of Dr. Morgan's dual employment, promised a benefit UNUM knew would not be applicable to his circumstances, affecting payment of the promised coverage for payment of the policy total disability benefit.   The representations were always on the one-hundred percent total disability payments being tied precisely to his duties as an emergency room physician, rather than to any duties of a physician generally.  Instead, UNUM conditioned the total disability coverage on the duties of both of his jobs as a physician.  Plaintiff will immediately supplement any factual details with specificity that the Plaintiff can identify that are not set forth above.

53.     The described representations were material and false and made at a time when UNUM knew they were false, or made as a positive assertion recklessly, without any knowledge of the truth.

54.     The described representations were made with the intention that Plaintiff should act upon them in purchasing this policy and the Plaintiff did rely upon this to his detriment.

55.     The described representations were words or conduct which created an untrue or misleading impression of the actual past or present facts in the mind of the Plaintiff.

56.     The described omissions and non-disclosure involved concealing and failing to disclose facts which UNUM had a duty to disclose.  Such facts were material

and were concealed or failed to be disclosed with intent of creating a false impression of the actual facts in the mind of the Plaintiff.

57.     UNUM concealed or failed to disclose these facts with the intention that they be acted upon by Plaintiff and Plaintiff did act in reliance upon it to his detriment.

58.     The described false representations, concealment and deceit induced the Plaintiff to purchase these insurance policies and Plaintiff, acting in reliance thereon, suffered injury.

59.     As a direct result of the described false representations, concealment, and deceit, Plaintiff suffered loss of the total disability benefit, waiver of premium and other policy coverage promised to him, emotional distress, frustration and duress and other consequential damages.

60.     UNUM's acts and omissions in this cause of action were with reckless disregard for the rights of others and/or were done intentionally and with malice and therefore Plaintiff is entitled to recover punitive damages.

WHEREFORE, Plaintiff prays for judgment against the Defendant, Provident Life and Accident Insurance Company, in an amount in excess of the jurisdictional amount set out in 28 U.S.C A. §1332 with interest and costs of this action, for a reasonable attorney fee, and for such other relief as may be appropriate.

<strong>MANSELL ENGEL & COLE</strong>

By:     s/Mark A. Engel
        Steven S. Mansell, OBA #10584
        Mark A. Engel, OBA #10796
        Kenneth G. Cole, OBA #11792
**JURY TRIAL DEMANDED**        204 North Robinson, 21st Floor

**ATTORNEY LIEN CLAIMED**          Oklahoma City, OK 73102-7201
T: (405) 232-4100 ** F: (405) 232-4140
E-mail:  mengel@meclaw.net
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2021, I filed the attached document with the Clerk of Court. Based on the records currently on file in this case, the Clerk of Court will transmit a notice of electronic filing to those registered participants of the electronic case filing system.

s/Mark A. Engel