## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICHARD R. MORGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-20-180-D |
| | ) | |
| PROVIDENT LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, a foreign | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

UNDISPUTED MATERIAL FACTS ................................................................ 2

    **I.**    **Application for Insurance** ................................................... 2

    **II. The IDI Policy Provisions** ................................................. 5

    **III. Plaintiff's Claim** ............................................................... 7

    **IV. Initiation of the Instant Litigation** ................................. 16

    **V.**   **Plaintiff's Appeal** .......................................................... 17

SUMMARY JUDGMENT STANDARD ........................................................ 20

ARGUMENTS AND AUTHORITY ............................................................... 21

    **I.**   **Plaintiff's Unavailing Fraud Claim** ................................. 21

    **II. Plaintiff Cannot Prevail on a Breach of Contract Claim Given Provident's Application of the Policy Terms** ................................. 29

    **III. Plaintiff Can Provide no Evidence to Support His Contention that Provident Acted in Bad Faith in Handling His Claim** ................................. 36

    **IV. Plaintiff Cannot Establish any Grounds for Punitive Damages** ................... 38

CONCLUSION ............................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Adams v. Amer. Guarantee & Liab. Ins. Co.*,
   233 F.3d 1242 (10th Cir. 2002) ...................................................................................... 21

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ......................................................................................................... 20

*Badillo v. Mid Century Ins. Co.*,
   2005 OK 48, 121 P.3d 1080 ............................................................................................ 36

*Bankers Trust Co. v. Brown*,
   2004 OK CIV APP 1, 107 P.3d 609 ................................................................................ 26

*Barnett v. Life Ins. Co. of the Sw.*,
   562 F.2d 15 (10th Cir. 1977) ............................................................................... 22, 25, 26

*Bowman v. Presley*,
   212 P.3d 1210 (Okla. 2009) ............................................................................................ 21

*BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*,
   2005 OK 65, 148 P.3d 832 .............................................................................................. 29

*Buzzard v. McDanel*,
   1987 OK 28, 736 P.2d 157 .............................................................................................. 37

*Cardoso v. Calbone*,
   490 F.3d 1194 (10th Cir. 2007) ...................................................................................... 21

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................................... 20

*Christian v. American Home Assur. Co.*,
   1977 OK 141, 577 P.2d 899 ............................................................................................ 36

*City National Bank and Trust Co. v. Jackson National Life Ins.*,
   1990 OK CIV APP 89, 804 P.2d 463 .............................................................................. 36

*Cont'l Res., Inc. v. Wolla Oilfield Servs. LLC*,
   20-CV-00200-PRW, 2021 WL 2905412 (W.D. Okla. July 9, 2021) ............................. 22

*Cooper v. National Union Fire Ins.*,
   1996 OK CIV APP 52, 921 P.2d 1297 ............................................................................ 38

*D & H Co., Inc. v. Shultz*,
   1978 OK 71, 579 P.2d 821 ......................................................................................... 21, 25

*Dardick v. Unum*,
   739 Fed.Appx. 481(10th Cir. 2018) ................................................................................ 33

*Darrell Harris, Inc. v. United States*,
   770 F. Supp. 1492 (W.D. Okla. 1991) ............................................................................ 23

*Duensing v. State Farm*,
   2005 OK CIV APP 15, 131 P.3d 127 .............................................................................. 38

*Eckert v. Flair Agency, Inc.,*
  1995 OK CIV APP 151, 909 P.2d 1201 ....................................................................25
*Fox v. Fox,*
  2017 OK CIV APP 17, 391 P.3d 124 .........................................................................23
*Garnett v. Government Employees Ins. Co.,*
  2008 OK 43, 186 P.3d 935..........................................................................................36
*Gary Family Tr. ex rel. Gary v. Gary,*
  CIV-20-618-G, 2020 WL 7138629 (W.D. Okla. Dec. 7, 2020)....................................22
*Gay v. Akin,*
  766 P.2d 985 (Okla. 1988) ..........................................................................................21
*Houchin v. Hartford Life Ins. Co.,*
  No. CIV-14-522-D, 2016 WL 502075 (W.D. Okla. Feb. 8, 2016)................................36
*Houston Oilers, Inc. v. Neely,*
  361 F.2d 36 (10th Cir. 1966).......................................................................................22
*JP Energy Mktg., LLC v. Comm. & Indus. Ins. Co.,*
  2018 OK CIV APP 14, 412 P.3d 121 .........................................................................29
*Kester v. Disan Eng'g Corp.,*
  1979 OK CIV APP 5, 591 P.2d 344 ............................................................................23
*Lukianczyk v. Unum,*
  2020 WL 7122007 (E.D. Cal. Dec. 4, 2020) ..............................................................33
*Manis v. Hartford Fire Ins. Co.,*
  1984 OK 25, 681 P.2d 760...........................................................................................38
*McLaughlin v. National Benefit Life Insurance Co.,*
  1988 OK 41, 772 P.2d 383...........................................................................................38
*Oulds v. Principal Mut. Life Ins. Co.,*
  6 F.3d 1431 (10th Cir. 1993).......................................................................................36
*Porter-Garcia v. Travis Law Firm, P.C.,*
  564 S.W.3d 75 (Ct. App. Tx. Dist. 1, 2018) ..............................................................22
*Provident Life & Acc. Ins. Co., Inc. v. Cochrane,*
  221 F.3d 1335, 2000 WL 799791 (6th Cir. 2000) ......................................................35
*PWB Dev., L.L.C. v. Acadia Ins. Co.,*
  No. CIV-17-387-R, 2018 WL 4088793 (W.D. Okla. Aug. 27, 2018)..............21, 22, 26
*Riverbend Land, LLC v. First Am. Title Ins. Co.,*
  No. CIV-18-0247-F, 2018 WL 4905353 (W.D. Okla. Oct. 9, 2018) ...........................29
*Sable v. City of Nichols Hills,*
  CIV-03-643-W, 2007 WL 9724195 (W.D. Okla. Nov. 6, 2007) ..................................23
*Salazar v. Contract Freighters, Inc.,*
  No. 18-CV-651-GKF-JFJ, 2019 WL 7605822 (N.D. Okla. Oct. 4, 2019) ...................21
*Silver v. Slusher,*
  1988 OK 53, 770 P.2d 878, 881...................................................................................26

*Sims v. Great American Life Ins. Co.*,
  469 F.3d 870 (10th Cir. 2006)..................................................................38
*Tucker v. Franciscan Villa, Inc.*,
  06-CV-0312-CVE-FHM, 2007 WL 2703194 (N.D. Okla. Sept. 17, 2007) ...................23
*Wilson v. Virtual Benefits Grp. Inc.*,
  CIV-19-335-D, 2020 WL 870234 (W.D. Okla. Feb. 21, 2020) ...................23

## Statutes

23 O.S. § 9(A)..................................................................38

## Other Authorities

10A Couch on Ins. § 147:29..................................................................29
OUJI-Civ. No. 18.1..................................................................21

## Rules

FED.R.CIV.P. 56..................................................................1
FED.R.CIV.P. 56(c)..................................................................20
L.CV.R. 56.1..................................................................1

## Treatises

44A Am. Jur. 2d Insurance § 1978..................................................................29

Defendant Provident Life and Accident Insurance Company ("Provident") moves this Court, pursuant to Rule 56, FED.R.CIV.P., and L.CV.R. 56.1, to enter summary judgment in favor of Defendant and against Plaintiff on each of his claims.

## INTRODUCTION

Plaintiff obtained an individual policy from Provident in 1987 (the "IDI Policy"). For over thirty years, Plaintiff chose to work two fulltime jobs as an emergency room physician and a clinical physician without any difficulty or adverse symptom. In March 2019, Plaintiff had a heart attack. Plaintiff would return to his office practice within a week but never attempted to return to the emergency room. Dr. William Collazo, Plaintiff's only medical provider, saw Plaintiff in April and again in July. Following the July visit, Dr. Collazo opined that Plaintiff was forever disabled from emergency room practice due to "stress." This conclusion was not supported by any objective standard, including those Dr. Collazo himself identified. Plaintiff has never been seen or treated by a behavioral specialist or received any treatment for "stress."

After this Court determined that the IDI Policy was unambiguous and thus Plaintiff's total disability claim was implausible, Plaintiff completely shifted strategies to focus exclusively on the denial of residual benefits. Now before the Court is (1) whether Plaintiff was disabled by "stress," based solely on a generic recommendation (unrelated to Plaintiff's condition or status) from a single provider that stress is bad and emergency room work is stressful; (2) if Provident acted in bad faith in making its determination; and (3) if fraud can exist where Plaintiff acknowledges having read the unambiguous provision at issue and even obtained separate insurance with a separate agent containing the same terms.

1

## <u>UNDISPUTED MATERIAL FACTS</u>

**I.    Application for Insurance**

1.    While a resident, Plaintiff met with Earl Chambers, an independent insurance agent, to discuss disability insurance coverage. Order of March 26, 2021 (Dkt. No. 12) at 12-13; Second Amended Complaint ("SAC") (Dkt. No. 29), ¶¶ 51-52.

2.    Plaintiff cannot recall how many times he talked to Mr. Chambers, but it was "at least two."  Plaintiff's Deposition Excerpts, attached as **Exhibit 1**, 113:4-7; 115:9.

3.    Plaintiff cannot recall where his discussions with Mr. Chambers occurred. *Id.* at 115:10-13.

4.    Plaintiff cannot recall actually signing the application or if it occurred during a meeting with Mr. Chambers. *Id.* at 117:21-118:7.

5.    During his deposition, Plaintiff could not recall if anyone else was present during the conversations with Mr. Chambers. *Id.* at 118:8-9. In his responses to requests for admission, Plaintiff admitted no one else was present. Plaintiff's Responses to Requests for Admissions, attached as **Exhibit 2**, Response No. 1.

6.    Plaintiff denies he recorded the conversation(s) with Mr. Chambers. RFA. Provident Life has no such recordings. *Id.,* Response No. 2.

7.    Plaintiff admits that he did not create any documents reflecting any purported misrepresentations at or near the time of the conversation(s). *Id.,* Response No. 3.

8.    Plaintiff admits that he does not have any solicitation materials provided contemporaneously with his conversation(s) with Mr. Chambers. *Id.,* Response No. 5. Regardless, Plaintiff further admits that he did not read those materials. *Id.,* Response No. 7.

9.      In his application,  Plaintiff provided:

- "Occupation: Physician"
- "Exact Duties: Usual to profession, resident"
- "To the best of my knowledge and belief, all of the foregoing statements …are true, complete and correctly stated. They are offered to Provident…as the basis for any insurance issued on this application."

Excerpts of Long Term Disability Claim File, attached as **Exhibit 3**, LTD000220.[1]

10.     Plaintiff also completed an application for disability with Commercial Insurance Company of Newark, N.J. on October 31, 1990. *Id.,* LTD002955-2956. Again, Plaintiff identified his occupation solely as a "physician."  On this occasion, Plaintiff utilized a different independent agent with C.L. Frates & Co., Inc. *Id.,* LTD002956.

11.     The Commercial Insurance Company policy provided the following definition of occupation:

Your Occupation means the occupation in which You are regularly engaged at the time You become disabled. If Your occupation is limited to a recognized specialty within the scope of Your degree or license, We will deem Your specialty to be your occupation. *Id.,* LTD002943.

12.     On April 10, 2000, C.L. Frates sent Plaintiff a page from his Commercial Insurance policy. The fax specifically highlighted this "limited to a recognized specialty" definition of occupation. *Id.,* LTD002961.

13.     The IDI Policy at issue here utilizes identical language:

Your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. ***If your occupation is limited to a recognized specialty within the scope of your***

---

[1] While Provident's production uses lengthy Bates-labelling prefixes, *e.g.*, the LTD file uses "UA-CL-LTD-NL 16575171-000001," references in the instant Motion will simply provide "LTD000001" or the appropriate equivalent.

***degree or license, we will deem your specialty your occupation.*** LTD000207 (emphasis added).

14.     This language was reiterated in Outline of Coverage provided with the IDI Policy. *Id.,* LTD000223.

15.     This IDI Policy provision is unambiguous. Dkt. No. 12, at 8.

16.     Plaintiff acknowledges that his occupation was not limited to a specialty:

> Q  And that sentence it says, "If your occupation is limited to a recognized specialty within the scope of your degree or license," your occupation wasn't limited to this specialty; correct? You had more than one occupation?
> A  Well, that's what this says, but verbally that's not what I agreed to. **Exhibit 1**, 96:15-21.

17.     Plaintiff recognizes that he purchased a policy with a specialty provision where his "occupation" was limited to that specialty: "If your occupation is limited to a recognized specialty within the scope of your degree," that is what was sold to me for the emergency room in 1987 by Mr. Chambers." *Id.,* 94:5-8.

18.     Plaintiff contends that he told Mr. Chambers:

> I wanted an ER specialty. He told me that this was for this job, this job I was going to have my specialty in ER, and that if I got disabled from it -- because as time went on, I was driving all over Oklahoma, you know. I was in the car driving to Altus and Lawton. I didn't know what was going to happen to me. So that's why this made perfect sense when I initially bought it and also as time went on, if I got disabled, that I would be totally disabled according to this policy. *Id.,* 124:1-10.

19.     Plaintiff acknowledges that his recollection was poor during this period:

> Q  Do you know whether he talked to you about other policies or other kinds of policies or other insurance companies' policies?
> A  He didn't talk to me about any other company policies. I don't remember…Because at the time, again, I'm a resident, I'm not sleeping great. *Id.,* 113:16-23.

4

20.    Plaintiff admits that he read the policy and specifically the provision at issue:

Q   Did you read the policy?
A   I read it the best I could at the time, and what's when I -- that's where that whole thing about the specialty thing made sense to me, that second sentence in that, because it was a specialty policy that I was sold for the ER. *Id.,* 124:14-21; *see also* 127:4 ("I read over it.").

21.    Plaintiff did not deal with Mr. Chambers when he increased his benefits. *Id.,* 117:1-4; 122:3-6; *see also* Application File Excerpts, attached as **Exhibit 4,** AP000090 (correspondence regarding increase with C L Frates); **Exhibit 3,** LTD002941, 002956, 002959 (C L Frates also handled Plaintiff policy with Commercial Insurance).

## II.    The IDI Policy Provisions

22.    Defendant issued Plaintiff's IDI Policy, policy number 6-335-785976, effective July 17, 1987. *Id.,* LTD002128-2163.

23.    The IDI Policy defines total disability as follows:

Total Disability or totally disabled means that due to Injuries or Sickness:

1.  you are not able to perform the substantial and material duties of your occupation; and
2.  you are receiving care by a Physician which is appropriate for the condition causing the disability. *Id.,* LTD002149.

24.    Residual Disability is defined as follows:

Residual Disability or residually disabled, during the [180 Day] Elimination Period, means that due to Injuries or Sickness:

1.  you are not able to do one or more of your substantial and material daily business duties or you are not able to do  your usual daily business duties for as much time as it would normally take you to do them;

5

2. you have a Loss of Monthly Income in your occupation of at least 20% and
3. you are receiving care by a Physician which is appropriate for the condition causing the disability.

After the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disable then means that due to Injuries or Sickness:

1. you have a Loss of Monthly Income in your occupation of at least 20%; and
2. you are receiving care by a Physician which is appropriate for the condition causing the loss of Monthly Income.

After satisfaction of the elimination period (where you are no longer required to have a loss of time or duties), reference to a "disability" has been removed and "Loss of Monthly Income" has been substituted to clarify our intent that a continuing loss of time or duties is not required beyond the elimination period. *Id.,* LTD002131; *see also* LTD002146.

25.    The IDI Policy also specifically defines loss of monthly income:

Loss of Monthly Income means the difference between Prior Monthly Income and Current Monthly Income. Loss of Monthly Income must be caused by the Residual Disability for which claim is made. The amount of the loss must be at least 20% of Prior Monthly Income to be deemed Loss of Monthly Income… *Id.,* LTD002153.

26.    "For premiums to be waived, you must give us satisfactory proof of disability…." *Id.,* LTD0002156.

27.    To make a claim, an insured must provide "written notice of claim…within 20 days after a covered loss starts or as soon as reasonably possible." *Id.,* LTD002160. Provident "will send you claim forms form filing proof of loss…[F]or a continuing loss, you must give us written poof of loss within 90 days after the end of each period for which we are liable. For any other loss written proof must be given within 90 days after such loss." *Id.* "After we receive written proof of loss, we will pay monthly all benefits then due

6

to you for disability. Benefits for any other loss covered by this policy will be paid as soon as we receive proper written proof." *Id.,* LTD002161.

28.     The Policy expressly provided Plaintiff the opportunity to review it and ensure it met his needs, with the option to cancel if he had concerns. *Id.,* LTD002144. It also expressly provided: "No agent may change this policy or waive any of its provisions." *See also* LTD002101 (providing similar language in the application).

## III.     Plaintiff's Claim

29.     Plaintiff suffered a myocardial infarction on March 17, 2019, and underwent successful angioplasty and stent treatment, performed by Dr. William Collazo. *Id.,* LTD000489, 001213, 002039-2045. During his treatment that day, his ejection fraction (EF), the percentage of blood pumped out by the left ventricle after each contraction, was 40 to 42 percent. *Id.,* LTD002039, 002041. He was doing well and walking around without problems the following day. *Id,* LTD000489. He discharged on March 19, 2019. *Id.*

30.     Plaintiff returned to work as internist on a week later, on March 25, 2019. *Id.,* LTD000167. He elected not to return to the emergency room.

31.     Plaintiff denies that his work in the emergency room is stressful:

> Q  How about -- any symptoms that you would consider to have been or to be stress induced or stress related? I'm now in March of 2019 time frame.
> A  I'm pretty chilled. So I'm not very stressed out. I don't get stressed out like panic attacks. Boy, working in an ER for so many years, you kind of have to be a little chill to do that. **Exhibit 1**, 60:10-17.
>
> Q  -- on March 17, 2019 had you had any way to identify whether you were suffering any stress-related symptoms?
> A  No. I didn't have any stress-related symptoms.
> Q  And you hadn't been -- you hadn't had any medical treatment or --
> A  None.

Q   -- anything associated with stress?
A   I'm not an alcoholic. I barely drink. I don't smoke.
Q   Hadn't seen any counselors?
A   No counselors, no marriage counselors. We never saw each other so that worked out…
Q   …Have you ever taken any medications associated with --
A   No.
Q   -- stress?
A   I've taken no medications until this whole thing happened. *Id.,* 61:4-25.

Q   …you had no reason to think or idea that the stress of an ER  physician, whatever that is, was causing you any kind of problem or health problem?
A   You mean before then?
Q   Yes.
A   No. I kind of thrived on it. My whole identity is helping people. That's what I like to do and it was. There's a lot of stuff that happens in an ER every single shift. *Id.,* 85:14-23.

32.     Plaintiff had one month follow up appointment with Dr. Collazo on April 22, 2019. **Exhibit 3,** LTD002414. Plaintiff's EF remained in the moderately abnormal range, 35-40%. He had occasional dizziness but no issues with shortness of breath, edema, palpitations or syncope. *Id.,* LTD002415. His blood pressure was 106/79 mmHg and heart rate was 67 bpm. *Id.,* LTD002414. The plan of treatment was limited to stopping spironolactone (an aldosterone blocking agent which treats high blood pressure and can cause dizziness), and to obtain an echocardiogram before his three-month follow-up. *Id.*

33.     That same day, Dr. Collazo completed the attending physician statement for submission to Provident. LTD000145-0149. He did not identify any physical restrictions. *Id.,* LTD000149. Physical limitations were to "discontinue physical exertion for chest pain, back pain or shortness of breath."  *Id.* For behavioral health restrictions, Dr. Collazo stated: "Limiting emotional stress has been shown to prevent recurrent MI – stress increases blood pressure, heartrate and vascular tone which can disrupt a vulnerable atherosclerosis

plaque." *Id.* Dr. Collazo did not provide for any behavioral health limitations. *Id.* The restrictions and limitations covered the date of the heart attack to "lifetime." *Id.*

34.     Plaintiff's claim form and accompanying materials were received by Provident on May 1, 2019. *Id., LTD000167.*

35.     Provident began investigating Plaintiff's claim, a complex process requiring the collection of materials and analysis related to both the disability itself, the applicability of the elimination period and the calculation of benefits under the residual policy provision. *See, e.g., id.,* LTD000355-0358, 0477-0480, 0511, 0515-0516, 2423-2424. For instance, Provident called or wrote Plaintiff over two dozen times before its January 2020 determination. *See, e.g.,* LTD000073, 0257, 0260, 0261, 0355, 0465, 0467, 0470, 0473, 0474, 0477, 0511, 0525, 1144, 2183, 2185, 2216, 2217, 2302, 2335, 2371, 2396, 2440, 2461, 2535, 2578,  Similarly, Provident reached out to Dr. Collazo at least ten times in an attempt to obtain information related to his recommendation to Plaintiff regarding his emergency room practice. *See, e.g.,* LTD002481-2482, 2503, 2507, 2509, 2531, 2532, 2560. The investigation would also be enlarged to include Plaintiff's separate claim under a group disability policy held by his employer. *See, e.g., id.,* LTD002302-2309; 2335-2336.

36.     On July 7, 2019, Plaintiff completed an echocardiogram. The test revealed that his EF had improved to 50%. *Id., LTD002413.*

37.     On July 22, 2019, Plaintiff went to Dr. Collazo for second follow-up appointment. *Id., LTD002411-2412.* Dr. Collazo noted that Plaintiff had been walking two miles a day but had occasional dizziness and hypotension. *Id., LTD002411.* Again, Plaintiff noted no chest discomfort, significant shortness of breath (although there was an occasional

shortness of breath), palpitations or syncope. *Id.,* LTD002412. His blood pressure was 119/80 mmHg, and heart rate was 81bpm (with variable but normal other readings depending on position). *Id.,* LTD002411. Dr. Collazo reviewed a prior stress test, that indicated he walked for 7 minutes and fifteen seconds, stopping only as a result of fatigue. *Id.,* LTD002412. Dr. Collazo took him off an angiotensin-converting enzyme (ACE) inhibitor, another blood pressure medicine, to address his hypotension and dizziness. *Id.* For the first time, Dr. Collazo discussed Plaintiff's work, stating: "After extensive discussion regarding life style changes post MI, have advised to curtail more stressful emergency room practice and would maintain less stressful office practice." *Id.*

38.     On August 9, 2019, Dr. Collazo executed a restrictions and limitations form that stated that Plaintiff had "no restrictions" and "no limitations."  *Id.,* LTD002046.

39.     Plaintiff went to see Dr. Collazo again on October 21, 2019. *Id.,* LTD003186-3188. During the visit, Plaintiff stated that he was walking two to four miles a day and had no new issues or complaints. *Id.,* LTD003186. His blood pressure was slightly elevated at 140/90 mmHg, and heart rate was 68 bpm. *Id.* His heart produced no thrills, lifts or palpable gallops. *Id.,* LTD003186. He had no murmur or pericardial friction rub. *Id.* His apical rhythm was regular. *Id.* His mood and affect were normal, without undue anxiety, depression or agitation. *Id.* Dr. Collazo also noted that Plaintiff's prior dizziness had resolved after the reduction of medication. *Id.* However, he did provide that Plaintiff should "avoid undue stress such as ER work."  *Id.* Dr. Collazo also sent a new restrictions and limitation form that provided Plaintiff should "avoid undue stress" and "no ER work schedule," both with an indefinite end date. *Id.,* LTD002410.

40.    That same day, the disability benefits specialist reached out to a clinical consultant to generally discuss Plaintiff's medical condition. *Id.,* LTD002400. "It was discussed that the claim would potentially show support until July 2019…however, additional information will be needed in order for the [restrictions and limitations] to continue to be support beyond that" *Id.*

41.    After receiving updated medical records including the October 21, 2019 visit, Provident conducted a forum involving the disability benefits specialist, the clinical consultant, the vocational consultant and the disability benefits specialist's supervisor. *Id.,* LTD002437-2438. The forum, reviewing job requirements and the medical records, including Dr. Collazo's inconsistent restrictions and limitations, determined that the claim required a full clinical analysis. *Id.* While it was noted that Plaintiff was an internal medicine physician by speciality and was performing this occupation plus a second occupation as an emergency room attending physician, which did not appear to be his specialty, the vocational consultant would carry out further analysis regarding the duties performed in the emergency room and Plaintiff's own practice. *Id.*

42.    A second forum was held a few days later, including the same individuals as well as Dr. Joseph Antaki, a board-certified internist. *Id.,* LTD002446. The vocational specialist reported:

> Insured is an Internal Medicine Physician by specialty and was performing this occupation plus a second occupation as an Emergency Department attending physician…He RTW to his IM practice on 3/25/19. The physical demands per the IDI def. of occupation would also be consistent with demands listed above including the cognitive demands. *Id.*

The cognitive demands referenced included performing effectively under stress. *Id.*
Dr. Antaki noted that Plaintiff's restrictions and limitations would be supported through
October 21, 2019 – namely Plaintiff's hypotensive blood pressure – but that the symptoms
appeared to have been resolved after that date. It was determined that Dr. Antaki would
seek additional information from Dr. Collazo regarding the purported ongoing restrictions
and limitations. *Id.,* LTD002446.

43.    On November 12, 2019, Provident received the completed occupational
duties form from Ameriteam, the entity through which Plaintiff was employed for
emergency work. Ameriteam identified Plaintiff as a "physician" with a job description of
"hospital physician." *Id.,* LTD002454-2455. Physical requirements included "continuous"
standing and walking, but all other requirements were "never" (climbing, crawling, etc.) or
"occasional," 1-33% of the time working (bending, twisting, sitting, pushing, etc.). *Id.,*
LTD002456-2457. Cognitive requirements included working under emergency and critical
situations, meeting deadlines, attention to detail, day-to-day contact with others, and
making independent decisions. *Id.,* LTD002457. The vocational representative would later
confirm that these duties were consistent with those identified as "Emergency Physician
eDOT #070.101-475," which is categorized as "light work." *Id.,* LTD002489.

44.    On November 15, 2019, Dr. Antaki wrote a letter to Dr. Collazo following
up on prior attempts to call regarding Plaintiff's purported restrictions and limitations:

> I was trying to reach you to discuss the restrictions/limitations for
> Dr. Morgan. I did not agree with your opinion that he was precluded from
> returning to "ER work." The records indicate Dr. Morgan had a stress test
> after his MI which was stopped due to fatigue, but the records do not describe
> there was documented ischemia. He walks up to 4 miles per day. Dizziness

resolved after his ACE-I was stopped. *Id.,* LTD002481-2482; *see also* LTD002509.

45.    Dr. Antaki also considered whether an IME was necessary "but there is sufficient medical data upon which to formulate an opinion; the issue here is one of interpretation of the available data and its functional implications...." *Id.*

46.    On November 21, 2019, Provident wrote to Plaintiff, providing that it would pay benefits from October 1, 2019 through October 21, 2019 based on his inability to work as an emergency room physician and his medical condition of old myocardial infarction and ischemic cardiomyopathy. *Id.,* LTD002496-2497. This would cover Plaintiff's residual disability after the Elimination Period (which did not begin to run until April 2019 given Plaintiff did not have a loss of income of greater than 20% for the month following his heart attack) until the date of his October 21, 2019 appointment. *Id.* The letter specifically noted that Plaintiff had to continue to meet the definition of disability in the policy and that validation of ongoing restrictions and limitations for the period after October 21, 2019 was required for additional benefits to be paid. *Id.,* LTD002497.

47.    Dr. Antaki referred Plaintiff's claim to Dr. Timothy McDermott, an interventional cardiology specialist and a Fellow of the American College of Cardiology and Fellow of the Society for Cardiovascular Angiography and Interventions, for review. *Id.,* LTD002504-2505. Dr. McDermott reached the following conclusions:

- The medical records presented to not support R & L's.
- The claimant has undergone revascularization 3/2019 and does not reportedly have significant residual coronary artery disease.
- During multiple follow up visits since the original event the claimant denies chest pains or dyspnea or other cardiac symptoms.

- Multiple cardiac examinations are reported to be unremarkable.
- Follow up stress test revealed reasonable exercise tolerance with no significant symptoms or evidence of ischemia.
- Claimant reportedly walks up to 4 miles daily.
- Blood pressure issues mild orthostatic hypotension are resolved off ACE inhibitors. *Id.,* LTD002505.

48.     Given the disagreement between Dr. Collazo's opinion on Plaintiff's restrictions and limitations and Dr. McDermott's findings, Provident referred the claim to another physician for a second review. *Id.,* LTD002511.  Dr. George DiDonna is a Fellow of the American College of Cardiology and is board certified in internal medical and cardiovascular diseases. *Id.,* LTD002512. He reached the following conclusions:

The insured had PCI stent to the LAD and [plain old balloon angioplasty]. LVEF was 42% which increased to 50% 7/2019 echocardiogram.

The insured complained of orthostatic dizziness and demonstrated orthostatic hypotension at the 7/19/2019 OV with Dr. Collazo. After a change in medication (d/c ACE inhibitor) this problem resolved. At this OV there was a discussion between the AP and claimant re1ative to decreasing his "work stress" compared to "pre-MI" status.

- There is no documentation of post MI myocardial ischemia with either physical stress (ETT) or mental stress.
- There is no evidence of heart failure.
- There are no impairing cardiac arrhythmias.
- There is no evidence of additional "high risk" coronary artery lesions by coronary angiography.

Based on a reasonable degree of medical certainty and while giving due deference to the opinion of Dr. Collazo the insured should reasonably have the physical capacity to perform the occupational duties of which he was capable prior to his Acute Ml. *Id.*

49.    On December 20, 2019, Plaintiff sent a letter to Dr. Antaki addressing  his medical issues. Plaintiff raised a number of concerns but did not provide any new medical evidence to support his inability to work in the ER. *Id.,* LTD002540.

50.    On December 30, 2019, Dr. Collazo provided a note regarding Plaintiff's ability to work in the emergency room. He noted his recommendation that Plaintiff stop his emergency room practice due to the stress involved with that type of practice. *Id.,* LTD002562. He also acknowledged that the was no demonstrable ischemia on Plaintiff's stress test but that the stress test was self-limiting. *Id.* He also noted "self-report[ed] intermittent angina responsive to sublingual nitrates, which may require enhance[d] anti-ischemic medical therapy and possibly another cardiac cath procedure." *Id.*

51.    As a result of this additional information, Provident requested Dr. McDermott conduct a review of his prior conclusion:

> First, the echocardiographic findings referenced do support some degree of damage to the myocardium but reported ejection fraction does not always correlate well with symptoms or degree of functional impairment…
>
> Second, the claimant now self-reports and this is also reported by his cardiologist as well that he is experiencing exertional angina and is now taking sublingual nitroglycerin. I note this was not reported in any of his office notes previously. Based on his statements this new development does not appear to be severely impairing given that he is still walking several miles daily; also the fact that this has been occurring since April yet he has not discussed this with his cardiologist until just recently nor insisted on a change in therapy also suggests this is not a severely limiting condition.
>
> Third, the claimant reports that he limited his stress test and did not exercise to the point of experiencing ischemia…Note that current guidelines regarding the performance of exercise stress tests indicate that the individual undergoing stress testing should exercise not to an arbitrary duration of exercise nor to an arbitrary heart rate achieved but rather to a symptom limited duration of exercise… *Id.,* LTD002571.

15

52.     Due to the ongoing conflict between Dr. Collazo and Dr. McDermott's opinions, Provident resubmitted the claim to Dr. DiDonna for another review. *Id.,* LTD002574. Dr. DiDonna concluded:

> The additional medical information including the insured's letter to Dr. Antaki (OSP) and the information from AP Collazo does not provide medical evidence to change my prior opinion. There is no evidence of myocardial ischemia by additional testing. The insured does not have unstable or intractable angina and his chest discomfort stops with stopping exertion and is relieved by rest or NTG (8 in 8 months).
>
> There is no behavioral health evaluation regarding mental stress preclusive of occupational activities detailed in the medical referral. *Id.*

53.     After receiving the doctor's opinions, the disability benefits specialist reached out again to Dr. Collazo's office to determine when Plaintiff's next appointment was and whether there was any testing or other specific reasons for the appointment. Dr. Collazo's office confirmed that there had been no visit since the October 21, 2019 appointment and that the upcoming visit was a routine follow-up. *Id.,* LTD002575-2576.

54.     On January 24, 2020, Provident sent a letter to Plaintiff declining to pay benefits under the Policy after October 21, 2019, given Plaintiff's medical improvements and continued ability to work and exercise. *Id.,* LTD002623-2629. The letter outlined the records obtained during the investigation and further noted that there was no evidence that stress limited Plaintiff or that he had received any behavioral assessment for stress. *Id.*

## IV.     Initiation of the Instant Litigation

55.     Plaintiff filed the instant suit on February 28, 2020. Dkt. No. 1. Plaintiff contended that he was totally disabled under the policy given that he was purportedly

disabled from working in the emergency room. *Id.* Plaintiff also alleged that Mr. Chambers had misrepresented the policy terms. *Id.*

56.   The Court dismissed Plaintiff's Complaint because it determined that the language of the Policy unambiguously provided that both Plaintiff's emergency room work and his internist practice were his occupation under the Policy and Plaintiff had returned to work full-time as an internist just a week after his heart attack. Dkt. No. 12 at 9-10.

57.   Plaintiff would file an Amended Complaint, jettisoning his prior theory in favor of a new contention that Provident improperly reversed its determination as to Plaintiff's entitlement to residual benefits. Dkt. No. 29.

**V.   Plaintiff's Appeal**

58.   On July 27, 2020, while the instant suit was pending, Plaintiff submitted an appeal of Provident's January 24, 2020 denial of the claim submitted under the group and individual policies. **Exhibit 3**, LTD002659-2662.

59.   During the intervening period, Plaintiff's physical condition has continued to improve.   Plaintiff's January 22, 2020 visit to Dr. Collazo's office showed his blood pressure was 122/86 mmHg, pulse was 67 bpm and heart sounds were appropriate. *Id.,* LTD003176-3178. On February 4, 2020, revealed that the ejection fraction (*i.e.*, percentage of blood leaving the left ventricle with each pump) remained at 50% and no significant concerns were noted. *Id.,* LTD003182. His next doctor's visit again revealed well controlled blood pressure and heart rate. *Id.,* LTD003173-3175. A May 19, 2020 stress test showed the ejection fraction had improved to 63%. *Id.,* LTD003179. A catheterization was carried out on June 4, 2020 to address a concern that arose from the stress test. *Id.,*

LTD003184. The catheterization confirmed that the ejection fraction was between 60%

and 65%. *Id.* It also found that Plaintiff's condition was stable and there was a minor

residual apical wall motion abnormality which was most likely the reason for the cause of

the unusual finding from the stress test. *Id.* Plaintiff was instructed to go home within a few

hours and restrict activity for a few days. *Id.* On July 1, 2020, Plaintiff had a follow-up

with Dr. Collazo. *Id.,* LTD003170. His blood pressure was 110/70 mmHg and pulse was

60 bpm. *Id.* He reported he was doing well and sought a medication change. He was not

scheduled to return for another appointment for six months. *Id.,* LTD003173.

      60.    After obtaining necessary records, Provident again submitted Plaintiff's

claim for physician review. *Id.,* LTD003195-3200. Dr. Chris Bartlett, a medical consultant,

conducted a review of the file. After an extensive summary of the records, he concluded:

> Taken together, the medical and functional data does not support insured
> would lack…physical functional capacity…
>
> Since insured's March 2019 MI, PTCA, and stenting, there is no indication
> that the insured has experienced stress-induced angina, or that he has
> problems with stress management or anxiety. OSP notes the experience of
> stress varies from person to person, and if the insured's experience of stress
> rose to a level of vocational impairment, we would expect he would pursue
> further treatment with a BH provider, or be referred for modalities....
>
> [T]he record indicates no active BH conditions and exams note "mood and
> affect normal. No undue anxiety, depression, or agitation".
>
> While the Cardiologist opines "no undue stress such as ER work", the Insured
> is not under the care of any BH specialist, is taking no BH meds, and has not
> been referred for stress-management modalities…
>
> Per his 12/20/19 letter, insured reports he has worked at least 70 hours a week
> for the last 33 years as both an IM physician and as an ER physician. There
> is no data in the file indicating he has had difficulty managing stress through
> decades of this intense schedule. *Id.,* LTD003198-3200.

61.     Dr. Bartlett recognized the importance of a specialist review give the centrality of Plaintiff's heart condition to his disability claim and referred the claim to Dr. Robert Bryg for assessment.  *Id.,* LTD003200. Dr. Bryg is a Fellow of the American College of Cardiology and has a subspecialty certification in Cardiovascular Disease. Bryg CV, attached as **Exhibit 5.** He assessed Plaintiff's condition as follows:

> From a cardiology standpoint, the insured does not lack the functional capacity for the light demands described for an ER physician. The claimant has had an MI with stenting. His EV function has improved to 50%. He has stable coronary artery disease with no high grade lesions…[H]he has no cardiovascular functional impairments. He could perform the light duty activities of an ER physician. *Id.,* LTD003202.

He also noted that a review of Plaintiff's mental stress was beyond the scope of his review and that it could be potentially evaluated by a specialist.  *Id.*

62.     On or about November 18, 2020, Dr. Bartlett called Dr. Peter Brown, a psychiatrist, to discuss the behavioral issues related to Plaintiff's claim. *Id.,* LTD003205; *see also* Affidavit of Dr. Peter Brown, **Exhibit 6**. Dr. Brown concluded that further psychiatric review was unnecessary. *Id.* Plaintiff had not – and did not – see a behavioral specialist or receive any evaluation, testing, treatment or medication for any behavioral conditions. *Id.* Plaintiff's cardiologist repeatedly stated: "Mental status alert and responsive. Oriented to time, place and person. Mood and affect normal. No undue anxiety, depression or agitation." *Id.* Plaintiff did not report symptoms or functional impairment (significant or otherwise) due to emotional distress. *Id.*

63.     Given the additional information from Plaintiff as well as Dr. Bryg's conclusion and his discussion with Dr. Brown, Dr. Bartlett reconsidered his evaluation of

Plaintiff's claim. *Id.,* LTD003204-3206. Dr. Bartlett again concluded that Plaintiff was not prevented from working in the emergency room. *Id.,* LTD003206.

64.   The additional medical reviews were provided to Plaintiff, with an opportunity to raise any final concerns regarding Provident's evaluation. Plaintiff responded by providing the curriculum vitae for Plaintiff and Dr. Collazo, as well as several cases involving Dr. Bartlett. *Id.,* LTD003232-3233.

65.   Provident denied Plaintiff's appeal on February 3, 2021. *Id.,* LTD003403-3413. In considering Plaintiff's contentions regarding his inability to work in the emergency room due to stress, the letter noted (1) there was no data suggesting Plaintiff had problems with stress over the prior 33 years, (2) that he had any behavioral issues, or (3) that Plaintiff was under the care of a behavioral provider or taking behavioral medications. In short, there were not physical or mental restrictions or limitations preventing Plaintiff from returning to work. *Id.,*  LTD003407-3408.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing a motion for summary judgment must offer evidence of specific facts, in admissible form, sufficient to raise "a genuine issue of material fact." *See Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). Conclusory allegations or denials do not suffice. *See id.* at 248. Opposition to summary judgment "must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary

judgment proceedings." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007).

"Because…defendant does not bear the ultimate burden of persuasion at trial… defendant 'may meet its burden by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Salazar v. Contract Freighters, Inc.*, No. 18-CV-651-GKF-JFJ, 2019 WL 7605822, at *1 (N.D. Okla. Oct. 4, 2019), quoting *Adams v. Amer. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2002).

## ARGUMENTS AND AUTHORITY

**I.     Plaintiff's Unavailing Fraud Claim**

Under Oklahoma jurisprudence, fraud claim has six elements:

1. That [Defendant] made a material representation;
2. That it was false;
3. That [Defendant] made it when [he] knew it was false, or made it as a positive assertion recklessly, without any knowledge of its truth;
4. That [Defendant] made it with the intention that it should be acted upon by [Plaintiff];
5. That [Plaintiff] acted in reliance upon it; and
6. That [Plaintiff] thereby suffered injury.

OUJI-Civ. No. 18.1; *see also Gay v. Akin*, 766 P.2d 985, 989 (Okla. 1988); *D & H Co., Inc. v. Shultz*, 1978 OK 71, 579 P.2d 821, 824. "Fraud is never presumed and each of its elements must be proved by clear and convincing evidence," which is "the highest standard of proof that the law imposes in civil cases." *PWB Dev., L.L.C. v. Acadia Ins. Co.*, No. CIV-17-387-R, 2018 WL 4088793, at *7 (W.D. Okla. Aug. 27, 2018), quoting *Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009). "[I]n drawing inferences from the facts, the court should not choose an imputation of fraud…[W]hen a transaction is fairly susceptible of two constructions, one which will free it from imputation of fraud will be adopted."

*Barnett v. Life Ins. Co. of the Sw.*, 562 F.2d 15, 19 (10th Cir. 1977). Moreover, if a plaintiff

must plead the "who, what, when, where, and how" of the alleged fraud," *Cont'l Res., Inc.*

*v. Wolla Oilfield Servs. LLC,* 20-CV-00200-PRW, 2021 WL 2905412, at *6 (W.D. Okla.

July 9, 2021), then he certainly must be provide proof to support those allegations.

> "[S]ummary judgment is appropriate where, under the uncontroverted facts,
> a plaintiff fails to demonstrate the viability of his claim." *Croslin v. Enerlex,*
> *Inc.*, 308 P.3d 1041, 1046 (Okla. 2013); *McNeese v. Access Midstream*
> *Partners, L.P.*, No. CIV-14-503-D, 2017 WL 972156, at *8–9 (W.D. Okla.
> Mar. 10, 2017). In weighing summary judgment, whether the jury could
> rationally find fraud, the Court must consider the high clear-and-convincing-
> evidence standard of proof. *N. Texas Prod. Credit Ass'n v. McCurtain Cty.*
> *Nat. Bank*, 222 F.3d 800, 813 (10th Cir. 2000)…

*PWB Development, L.L.C*, at *5. "Fraud cannot be inferred from the 'vague, indefinite, and

inconclusive' testimony of interested witnesses. And evidence so weak that it creates only

a mere surmise or suspicion of intent not to perform constitutes no evidence." *Porter-*

*Garcia v. Travis Law Firm, P.C.,* 564 S.W.3d 75, 89 (Ct. App. Tx. Dist. 1, 2018) (internal

citations omitted). As addressed in *Houston Oilers, Inc. v. Neely,* 361 F.2d 36, 42 (10th

Cir. 1966):

> There is insufficient evidence to sustain a finding of… misrepresentation on
> the part of Houston amounting to fraud…It is true that Neely testified that it
> was his understanding that the contracts were not to become effective until
> after the game on January 2nd. The contracts, however, provided otherwise,
> and we are not at liberty to rewrite them.

Thus, summary judgment should be granted where Plaintiff can only provide his own

uncorroborated testimony.[2]

---

[2] *Gary Family Tr. ex rel. Gary v. Gary*, CIV-20-618-G, 2020 WL 7138629, at *4 (W.D.
Okla. Dec. 7, 2020) (remanding case because "Defendants rely almost entirely on the self-
serving testimony of Steve for the proposition that the alleged malfeasance…Defendants

Plaintiff's fraud claim is expressly limited to his interactions with Mr. Chambers, which occurred at the time he purchased the policy in 1987. Dkt. No. 29, ¶¶ 44-52; UMF 22. As an initial matter, Plaintiff cannot establish that Mr. Chambers was acting as Provident's agent when Plaintiff obtained the IDI Policy. *Wilson v. Virtual Benefits Grp. Inc.*, CIV-19-335-D, 2020 WL 870234, at *4 (W.D. Okla. Feb. 21, 2020). Without such evidence, Provident cannot be liable of Mr. Chamber's purported misrepresentations.

Moreover, Plaintiff cannot establish that Mr. Chambers made a material statement, or any specific statement for that matter:

- Plaintiff cannot recall how many times he talked to Mr. Chambers. UMF 2.
- Plaintiff cannot recall where he talked to Mr. Chambers. UMF 3.
- Plaintiff cannot recall who was with him when he talked to Mr. Chambers. UMF 5.
- Plaintiff did not retain or create documents related to the conversation(s) with Mr. Chambers. UMF 7.
- Plaintiff does not have any recordings of the conversation. UMF 6.
- Plaintiff does not have an solicitation materials relating to the IDI Policy. UMF 8.

---

submit no evidence to corroborate Steve's testimony."); *Sable v. City of Nichols Hills*, CIV-03-643-W, 2007 WL 9724195, at *10 (W.D. Okla. Nov. 6, 2007) ("Sable has not presented any facts at this stage that are sufficient to create a jury question; he has relied solely on his own self-serving testimony, which lacks any independent factual support in the record…"); *Tucker v. Franciscan Villa, Inc.*, 06-CV-0312-CVE-FHM, 2007 WL 2703194, at *8 (N.D. Okla. Sept. 17, 2007) (granting summary judgment where plaintiff "provides no evidence-other than her self-serving testimony-to support her assertion."); *Darrell Harris, Inc. v. United States*, 770 F. Supp. 1492, 1498 (W.D. Okla. 1991) (granting summary judgment in part on the fact that "there is no evidence…except for the conclusionary, self-serving testimony of Harris"); *Fox v. Fox*, 2017 OK CIV APP 17, ¶ 12, 391 P.3d 124, 128 ("Thomas is seeking to avoid summary judgment by "creating" an issue of fact with his self-serving testimony. Further, Thomas's testimony is not uncontroverted or otherwise supported by the record. Thomas's testimony is the only evidence in this record suggesting that Tim did not have probable cause to file the federal court litigation."); *Kester v. Disan Eng'g Corp.*, 1979 OK CIV APP 5, 591 P.2d 344, 346 ("The only evidence in the record to support such a conclusion is the self-serving testimony of Brown…at best, is speculative and shows he was not sure what type of tenancy existed."). !

Moreover, Plaintiff generally admits that his recollection was limited during the period in which he purchased the policy. UMF 19. When asked about whether Mr. Chambers presented him with policies from other companies, he provided: "I don't remember…Because at the time, again, I'm a resident, I'm not sleeping great." *Id.*

For these same reasons, Plaintiff cannot provide evidence that Mr. Chambers made a false statement. As this Court has previously recognized: "Even viewed as a factual description of the coverage provided by the Policy, Mr. Chambers' [alleged] statement was accurate if Plaintiff limited his work to a specialty practice." Dkt. No. 12 at 15. This means that Plaintiff can only possibly allege fraud on a very narrow basis – Mr. Chambers would have had to actually state that Plaintiff would be totally disabled under the policy if he could not work as an emergency room physician, ***regardless*** of what work he could still perform. However, Plaintiff's testimony repeatedly discusses what he "wanted" but does not state that Mr. Chambers told him that he would be paid as totally disabled solely because he could not work in the emergency room. UMF 18. Plaintiff contends:

> I wanted an ER specialty. He told me that this was for this job, this job I was going to have my specialty in ER, and that if I got disabled from it -- because as time went on, I was driving all over Oklahoma, you know...I didn't know what was going to happen to me. So that's why this made perfect sense when I initially bought it and also as time went on, if I got disabled, that I would be totally disabled according to this policy.

*Id.* This is precisely what occurred. Mr. Chambers found Plaintiff a policy that would provide total disability if Plaintiff could not perform that specialty. As the Court has already noted, the IDI Policy did just that. Dkt. No. 12, at 15. Plaintiff does not allege here that Mr. Chambers made a false statement – what Mr. Chambers purportedly said was

completely accurate. *Id.* Plaintiff further confirms that Mr. Chambers did not make a false statement: "If your occupation is limited to a recognized specialty within the scope of your degree, that is what was sold to me for the ER in 1987 by Mr. Chambers."  UMF 17. Regardless, even if Plaintiff expressly contended that Mr. Chambers stated that the policy would cover his emergency room specialty regardless of whether he worked a second job, Plaintiff's statement is wholly self-serving and uncorroborated by any other evidence. As establish by the authorities discussed above, such "recollections" alone simply cannot be enough, particularly in light of the clear and convincing standard for fraud.

Plaintiff must further establish that Mr. Chambers knew that this purported statement was false, or that it was made recklessly without any knowledge of its truth. As set forth in *Eckert v. Flair Agency, Inc.,* 1995 OK CIV APP 151, 909 P.2d 1201, 1204: "[T]he statement must either be known to be false, or the speaker must make a positive assertion on a subject about which he or she knows little or nothing."  Evidence limited to the breach of contract claim alone is insufficient. *D & H Co., Inc. v. Shultz*, 1978 OK 71, 579 P.2d 821, 824 (addressing a breach of warranty and fraud).

> [T]he Oklahoma court has held that there must be proof of specific intent to sustain a verdict. Jones v. Jones, Okl., 290 P.2d 757. The court there again said in the proof of fraud, the evidence must be "…clear, satisfactory, and convincing…" [A] fraud case should not go to the jury "...unless facts are produced from which an irresistible deduction of fraud reasonably arises.

*Barnett v. Life Ins. Co. of the Sw.*, 562 F.2d 15, 19 (10th Cir. 1977). In other words, Plaintiff's allegation that Mr. Chambers committed fraud because the contract was breached (something the Court has already determined did not occur) is no evidence at all.

Plaintiff must also establish that Mr. Chambers intended for Plaintiff to rely on this purported statement. There simply is no such evidence here.

Plaintiff must also show that he acted in reliance on Mr. Chambers' purported statement. Plaintiff's reliance on the statement must be justifiable. *Id.* In *PWB Dev., L.L.C. v. Acadia Ins.* Co., CIV-17-387-R, 2018 WL 4088793 (W.D. Okla. Aug. 27, 2018), Judge Russell held that summary judgment was appropriate, in part because that the insured's reliance was unfounded given the vague and/or ambiguous nature of the representations relied on. The Court has recognized how nuanced the purported statement at issue here must have been, Dkt. No. 12, at 15, yet Plaintiff's own testimony establishes that he himself cannot make that distinction. Moreover, given how important Plaintiff contends that this specific issue – being considered totally disabled when unable to work in the emergency room regardless of other employment – was to him, Plaintiff plainly should have reviewed the policy to ensure that this specific issue was covered. "An action for fraud may not be predicated on false statements when the allegedly defrauded party could have ascertained the truth with reasonable diligence." *Bankers Trust Co. v. Brown,* 2004 OK CIV APP 1, 107 P.3d 609, 614, *quoting Silver v. Slusher,* 1988 OK 53, 770 P.2d 878, 881. More specific to the instant circumstances, "looking to the justifiability of Plaintiff's reliance, it strains credulity that Plaintiff would expect a certain type of coverage without even requesting the policy to read its terms." *PWB Dev.,* 2018 WL 4088793, at *7.

Apparently, Plaintiff contends that he did, in fact, read the IDI Policy:

I did as best I could. Here's 40 pages to a busy resident. But, yeah, I did. I skimmed the policy. I read it the best I could at the time, and what's when I - - ***that's where that whole thing about the specialty thing made sense to me,***

26

> ***that second sentence in that, because it was a specialty policy that I was
> sold for the ER.*** UMF 20.

To be clear, Plaintiff admits that he not only read the Policy, but the specific provision at

issue here (*i.e.*, "that second sentence"):

> Your occupation means the occupation (or occupations, if more than one) in
> which you are regularly engaged at the time you become disabled. ***If your
> occupation is limited to a recognized specialty within the scope of your
> degree or license, we will deem your specialty your occupation.*** UMF 13.

Notably, after quoting this policy definition of "occupation," this Court found it

unambiguous. Dkt. No. 12 at 8; UMF 15, 56. The Court further provided: "Plaintiff does

not explain how his occupation could possibly be 'limited to a specialty practice' within

the meaning of the contract under these factual circumstances." *Id.* at 10. Plaintiff has also

acknowledged "that's what this says, but verbally that's not what I agreed to."  UMF 16.

Plaintiff's purported understanding also ignores the purpose of a disability policy.

As the Court has opined:

> The policy does not treat an insured's occupation as fixed or unchanging but,
> instead, expressly defines the insured's occupation to mean the one (or ones)
> in which he is regularly engaged when he becomes disabled. Thus the key to
> coverage of Plaintiff's disability claim is his occupation or occupations in
> March 2019.

Dkt. No. 12, at 10. Plaintiff's purported understanding ignores this fundamental finding.

If, for example (based on Plaintiff's position), he had become disabled before becoming a

licensed doctor, given he obtained the IDI Policy as a resident, then Plaintiff's own theory

would prevent him from receiving disability benefits because he had no emergency room

specialty. Or if, under his theory, Plaintiff had ceased working in the emergency room

before his heart attack, he would no longer be entitled to any benefits under the Policy as a specialty. This cannot be the case.

Plaintiff was given an opportunity to review the Policy and determine it met his needs, allowing him to cancel it if he had concerns. UMF 28. The Policy also specifically provides (and the application with similar language) that "***[n]o agent may change this policy or waive any of its provisions***." *Id*. Despite having reviewed the specific provision at issue, Plaintiff did not cancel the Policy or seek clarity on what he now contends was the most essential issue in his purchase. Moreover, Plaintiff would utilize C.L. Frates, a completely different agency, to increase his benefits under the IDI Policy. UMF 21. It is unclear how Plaintiff could rely on a different agency in addressing his policy needs while still claiming that Mr. Chambers was responsible for defrauding him.

It is also important to recognize that this was not the only disability policy that Plaintiff obtained. In 1990, just three years later, Plaintiff worked with a C.L. Frates agent to obtain a policy with Commercial Insurance Company of Newark, N.J. UMF 10. During the application, Plaintiff identified himself as a "physician." *Id*. This policy specifically defined occupation as a specialty "if Your occupation is limited to the recognized specialty within the scope of Your degree or license." – the ***identical*** language used in the IDI Policy. UMF 13. A decade later, C.L. Frates would fax Plaintiff an excerpt of the Commercial Insurance Company policy specifically highlighting (with an arrow in the margin), this definition of occupation. UMF 12. In short, Plaintiff not only knew what language was contained in the IDI Policy here – because he specifically read it – but he also obtained another policy with identical language, which was specifically identified for him a decade

later. It is impossible to claim reasonable reliance on a statement – for which there is no evidence whatsoever – when Plaintiff knew exactly what the unambiguous provision said.

Finally, regardless of the merits of such fraud allegations, Plaintiff is not disabled under the policy and thus has suffered no loss as a result of the purported fraud.

## II.   Plaintiff Cannot Prevail on a Breach of Contract Claim Given Provident's Application of the Policy Terms

"In Oklahoma, interpretation of an insurance contract is a matter of law." *Riverbend Land, LLC v. First Am. Title Ins. Co.*, No. CIV-18-0247-F, 2018 WL 4905353, at *3 (W.D. Okla. Oct. 9, 2018).

> Parties may contract for risk coverage and will be bound by policy terms. When policy provisions are unambiguous and clear, the employed language is accorded its ordinary, plain meaning; and the contract is enforced carrying out the parties' intentions. The policy is read as a whole, giving the words and terms their ordinary meaning, enforcing each part thereof. This Court may not rewrite an insurance contract to benefit either party...We will not impose coverage where the policy language clearly does not intend that a particular individual or risk should be covered.

*BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 2005 OK 65, ¶ 6, 148 P.3d 832; *JP Energy Mktg., LLC v. Comm. & Indus. Ins. Co.*, 2018 OK CIV APP 14, ¶ 14, 412 P.3d 121, 125.

Clearly, Plaintiff is required to establish the elements of his claim, including a breach of the policy. OUJI-Civ. 23.1. This includes the burden of proof as to "entitlement to benefits under a disability policy."  44A Am. Jur. 2d Insurance § 1978, *see also* 10A Couch on Ins. § 147:29; *see also* UMF 26-27 (reflecting specific terms in IDI policy regarding necessary proof). Plaintiff could not establish entitlement under the total disability provision as he continued to work. UMF 23, 56. Similarly, Plaintiff cannot establish a breach of contract under his completely new theory related to residual disability

29

(UMF 57), as there is a complete absence of evidence to establish Plaintiff's disability. Specifically, Dr. Collazo, while stating that Plaintiff was unable to work in the emergency room due to stress, also enumerated the reasons that mental stress can be problematic – none of which existed for Plaintiff.

This Court has already resolved Plaintiff's claim regarding the definition of occupation. Dkt. No. 12. Plaintiff simply is not totally disabled under the terms of the IDI Policy given his continued work. *Id.* Plaintiff is thus left to argue that he is residually disabled. During the course of its investigation and evaluation of Plaintiff's claim, Provident determined that Plaintiff was disabled under the terms of the IDI Policy from performing his emergency room work based on the records provided through October 21, 2019. UMF 46. However, Plaintiff's October 21, 2019 visit with Dr. Collazo revealed that Plaintiff did not appear to meet the definition of disability.  He had no new complaints, no chest pain and no shortness of breath. UMF 39. His heart produced no thrills, lifts or palpable gallops. His apical rhythm was regular. *Id.* His mood and affect were normal, without undue anxiety, depression or agitation. *Id.* Dr. Collazo also noted that Plaintiff's prior dizziness had resolved after the reduction of medication. *Id.*

The decision to pay benefits through October 21, 2019 was predicated on his medical condition – *i.e.*, the relatively recent heart attack, the initial concerns revealed by Plaintiff's low but improving ejection fraction, and issues with low blood pressure – and not his general claim that stress prevented him from returning to the emergency room. UMF 36, 37, 41-45. This approval for benefits was made despite the fact that Dr. Collazo had stated in August 2019 that Plaintiff was no longer subject to any restrictions or

limitations. UMF 38. The October visit revealed that Plaintiff's medical condition had improved; that improvement, in turn, established that there was no proof of continuing disability, a requirement noted in the November 21, 2019 correspondence. UMF 46.

Provident specifically and repeatedly sought to obtain additional evidence from Dr. Collazo, Plaintiff's sole medical provider regarding his condition. UMF 35. Provident confirmed that Plaintiff was not scheduled for another appointment until January 22, 2020, and it was a follow-up, with no additional testing. UMF 53. Provident also obtained an additional note from Dr. Collazo did nothing to substantiate any limitations, due to any medical or behavioral condition. UMF 50. While Dr. Antaki had noted his concerns about Dr. Collazo's statement regarding Plaintiff's limitations, UMF 44, Drs. McDermott and DiDonna, both cardiovascular specialists, reviewed, and re-reviewed, Plaintiff's records. UMF 47-48, 51-52. Neither identified any basis for Plaintiff's claim for continued disability or Dr. Collazo's recommendation that Plaintiff cease emergency room work. *Id.*

"Stress" is a relatively generic term, used differently depending on the context. "Stress tests" are regularly performed on patients to determine whether their hearts act irregularly during physical activity. Here, Plaintiff's stress test did not reveal any concerns. UMF 37. While Dr. Collazo noted that a stress test were stopped due to Plaintiff's inability to further exert himself, this simply reflects that, at maximum physical exertion, his heart performed appropriately. UMF 51. In other words, if one has exercised as hard as he can without incident, then he cannot exercise to a point that would cause heart problems.

As more regularly used, "stress" refers to a mental state or condition. "Stress" could precipitate a mental health condition so severe that it could be disabling. Such is not the

case here. Instead, Plaintiff appears to be focused on a contention that a mental form of stress prevented him from working as an emergency room doctor because stress was bad for his heart health. Plaintiff presents no evidence whatsoever to support this claim. While there have been recommendations for patients with heart conditions to take a variety of steps to improve their health – to exercise, sleep well, eat a heart healthy diet and lose excess weight as well as limit stress – Plaintiff presented no information to Provident that (1) stress has a direct connection to an increased risk of a future heart attack, (2) Plaintiff was under stress generally, (3) Plaintiff was under stress working in the ER, (4) any emergency room related stress would be sufficient to cause any concern regarding his heart health, or (5) Plaintiff had any treatment, medication or evaluation for stress.

In completing the attending physician statement for Plaintiff's disability claim, Dr. Collazo did not suggest that Plaintiff was negatively affected by stress from his emergency room practice. Instead, he provided: "Limiting emotional stress has been shown to prevent recurrent MI – stress increases blood pressure, heartrate and vascular tone which can disrupt a vulnerable atherosclerosis plaque." UMF 33. Without conceding the accuracy of Dr. Collazo's assertion, it is clear that the objective factors identified by Dr. Collazo were neither problematic nor present for Plaintiff. Plaintiff never had issues with high blood pressure, which would be problematic in and of itself, but also serves as an indicator of issues with vascular tone. UMF 32, 37 and 39. In fact, Plaintiff had issues with low blood pressure which were resolved when Dr. Collazo took him off blood pressure medication. UMF 32, 37. Similarly, Plaintiff's heart rate was never a concern. UMF 32, 37 and 39. Such positive observable conditions were reflected in Plaintiff's visits to Dr.

Collazo and in the various tests (including his stress tests). *Id.* Additionally, Plaintiff failed to have testing for stress induced conditions by any other means, such as skin conductance responses, blood or urine catecholamine and hormone levels, cold pressor tests or ultrasounds of vascular function. Dr. Collazo never referred Plaintiff for cardiac rehabilitation, a program recommended by both the American Heart Association and the American College of Cardiology,[3] or any other treatment that could help Plaintiff achieve his prior functional capacity, presumably because it was unnecessary.

Moreover, despite the "behavioral health restriction," Plaintiff ***never*** completed any behavioral health evaluation or received any behavioral health treatment. As noted above, Plaintiff must provide proof of disability, UMF 26-27, something that never occurred with regard to "stress."  In addition, the residual disability provision provides that the insured must be "receiving care by a Physician which is appropriate for the condition causing the loss of Monthly Income." UMF 24; *see also* UMF 23 (providing a similar requirement for total disability).  If Plaintiff were so disabled by stress as to have the requisite loss of monthly income, then treatment by a physician which is appropriate for the condition is necessary. Yet Plaintiff never once saw a behavioral health provider or received any treatment for the alleged disabling condition. *See, e.g., Dardick v. Unum*, 739 Fed.Appx. 481, 486 (10th Cir. 2018) and *Lukianczyk v. Unum,* 2020 WL 7122007, *7 (E.D. Cal. Dec. 4, 2020) (both provided by Plaintiff's counsel during Plaintiff's appeal of Provident's decision, LTD003249-003261 and LTD003300-003305, noting the insured's failure to

---

[3]  *See, e.g.,* https://www.acc.org/latest-in-cardiology/ten-points-to-remember/2018/03/28/16/17/2018-acc-aha-clinical-performance-and-quality-measures-for-cr.

obtain treatment for behavioral health issues). UMF 64. While psychometric questionnaires like the Perceived Stress Scale-10 and the Perceived Stress Questionnaire can only measure one's perceived emotional response which may diverge from the behavioral and physical manifestations of stress, they are cheap and widely available. Such testing could have provided some insight if Plaintiff or his treating physician believed that a behavioral health condition prevented his return to work in the emergency room.

Additionally, Plaintiff failed to provide any evidence of how he was negatively affected by stress as an emergency room physician. Stress is a mental condition that affects different people in different ways in different circumstances. Plaintiff acknowledged that he worked for thirty years in the emergency room without any negative issues relating from stress, thriving in the environment. UMF 31. He never returned after his heart attack. UMF 30. Thus, there is absolutely no evidence that his emergency room work caused him stress or that such stress presented any physical concerns regarding his heart condition.

Defendant is not contending that Plaintiff would have to have another heart attack to prove that "stress" prevented him from working as an emergency room physician. However, Plaintiff must provide some evidentiary support for his claim. Every observable indicator of stress was negative, including those specifically identified by Dr. Collazo. UMF 32, 33, 37 and 39. Plaintiff never underwent any of a litany of other tests available to measure the effects of stress nor did he receive any behavioral evaluation or treatment.

Plaintiff makes an additional argument that, regardless of whether or not he was disabled on October 21, 2019, he is disabled under the IDI policy because he was deemed disabled during the Elimination Period. Dkt. No. 29, ¶ 22. Plaintiff is arguing that because

34

he is not required to prove that he has a loss of duties or time after the elimination period, UMF 24, he does not have to establish that his disability is the cause of his decreased income after the end of the elimination period. Dkt. No. 29, ¶ 22. This contention is logically unsupported, as proof of loss of duties or time is not the same as proof of continuing disability. This argument also completely ignores the fact that the IDI Policy expressly requires the continued connection between the "loss of income" "due to Injuries or Sickness." The Residual Disability provision requires that "Residual Disability...means that **due to Injury or Sickness**" Plaintiff has the requisite financial loss and receiving care for the debilitating condition. UMF 24. This requirement is confirmed in the definition of "Loss of Monthly Income" which requires that "Loss of Monthly Income **must be caused by the Residual Disability for which claim is made**." UMF 25.

The Sixth Circuit address this specific issue in *Provident Life & Acc. Ins. Co., Inc. v. Cochrane*, 221 F.3d 1335, 2000 WL 799791, *3-4 (Table) (6th Cir. 2000):

> Although Cochrane would have us conclude otherwise, the plain language of the insurance policy demonstrates that Cochrane must show a degree of causation between his disability and his loss of income. [T]he contract reads, "Loss of Monthly Income *must be caused by* the Residual Disability for which claim is made." (Emphasis added.) Also, the definition of residual disability states that the loss of income must be *"due to* Injuries or Sickness" and occur *"as a result of* the same Injuries or Sickness."...These phrases leave no doubt that causation is required...thus the question of causation must entail reference to the time frame used for prior monthly income, as the district court concluded.

(Emphasis in original). Plaintiff's reading of the Residual Disability provision is illogical and inconsistent with the plain language of the IDI Policy.

35

**III.    Plaintiff Can Provide no Evidence to Support His Contention that Provident Acted in Bad Faith in Handling His Claim**

The duty of good faith does not require an insurer to pay every claim made by an insured, and there may be valid disagreements between the parties. *Christian v. American Home Assur. Co*., 1977 OK 141, 577 P.2d 899, 905; *see also Badillo v. Mid Century Ins. Co.,* 2005 OK 48 ¶ 28, 121 P.3d 1080, 1093 ("[t]he essence of an action for breach of the duty of good faith and fair dealing 'is the insurer's unreasonable, bad-faith conduct'"). Rather, as *Badillo,* 121 P.3d at 1094, clarifies, the "bad faith" requires a showing of "more than simple negligence." Thus, "a party prosecuting a claim of bad faith carries the burden of proof and must plead all of the elements of an ***intentional*** tort." *Garnett v. Government Employees Ins. Co.*, 2008 OK 43, 186 P.3d 935, 944 (emphasis added).

As stated in *City National Bank and Trust Co. v. Jackson National Life Ins.,* 1990 OK CIV APP 89, ¶ 18, 804 P.2d 463, 468: "[B]efore the issue of insurer's alleged bad faith may be submitted to the jury, the Trial Court must first determine, *under the facts of the particular case* and as a matter of law, whether insurer's conduct may be reasonably perceived as tortious." Thus, "the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for [its determination]." *Houchin v. Hartford Life Ins. Co.*, No. CIV-14-522-D, 2016 WL 502075, at *6 (W.D. Okla. Feb. 8, 2016), citing *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993).

After this Court rejected Plaintiff's unsupported shotgun approach to pleading his bad faith cause of action, Plaintiff filed a Second Amended Complaint alleging that

Provident simply ignored his "stress" as a debilitating factor. Dkt. No. 29 (throughout). As previously noted, Plaintiff's "stress" claim must have factual support. Here, Plaintiff chose not to return to his emergency room work, while resuming his office practice within a week of his heart attack. UMF 30. It was not until his July 22, 2019 visit that Dr. Collazo stated: "After extensive discussion regarding life style changes post MI, have advised to curtail more stressful ER practice." UMF 37. Dr. Collazo did not provide *any* medical support for his position and did not refer Plaintiff to a behavioral specialist or prescribe other testing to support his conclusion. *Id.* Indeed, the medical evidence indicated that he was not at greater risk as a result of stress. Plaintiff's echocardiograms, stress tests and basic health measures all indicated that stress was not a debilitating issue. UMF 32, 37, 39.

Despite Plaintiff's contention, Provident did not ignore Plaintiff's purported stress. The vocational specialist conducted a review of his occupation and did not identify any factors which would indicate one practice was more stressful than the other. UMF 42, 43. Dr. Antaki contacted Dr. Collazo for further explanation regarding his opinion. UMF 44. Dr. McDermott and Dr. DiDonna both reviewed, and re-reviewed, the medical records, and found no evidence that Plaintiff was unable to return to work as a result of stress.[4] UMF

---

[4] A month after Provident's determination, Plaintiff filed the instant suit. UMF 55. Per *Buzzard v. McDanel,* 1987 OK 28, ¶ 10, 736 P.2d 157, 159, and its emphasis on the time of performance, Provident's determination in January 2020 would provide an end date for any potential bad faith claim. Simply put, to have a lawsuit, the purported wrong must have been committed prior to its filing or Plaintiff would have no action to allege. However, this case is more complicated given the fact that, six months after Provident's determination and five months after the litigation as filed, Plaintiff appealed Provident's determination. UMF 58. Regardless, Plaintiff cannot contend that Provident acted in bad faith regarding its disability determination, as the additional records provided by Plaintiff served only to establish his continued medical improvement and decision not to obtain any behavioral health treatment.

47, 48, 51, 52. Following Plaintiff's appeal, Provident again reviewed Plaintiff's claim. Dr. Bartlett could not identify any support for Plaintiff's continued disability and consulted both a cardiologist and a psychiatrist who concurred. UMF 60-63. Plaintiff's appeal was ultimately denied, but only after such exhaustive efforts to determine whether he was disabled under the Policy. UMF 65. Rather than ignoring Plaintiff's "stress" claim, Provident made a wholly reasonable determination based on a through and complete investigation.

## IV.   Plaintiff Cannot Establish any Grounds for Punitive Damages

As established by the undisputed facts, Provident's denial of coverage was both correct and reasonable as a matter of law. Without a bad faith cause of action, there can be no punitive damages. *Manis v. Hartford Fire Ins. Co.,* 1984 OK 25, ¶¶ 11-13, 681 P.2d 760, 762; *Duensing v. State Farm*, 2005 OK CIV APP 15, 131 P.3d 127, 128. Moreover, a plaintiff will not be routinely entitled to punitive damages even if bad faith exists. *Sims v. Great American Life Ins. Co.*, 469 F.3d 870, 891-894 (10th Cir. 2006); *McLaughlin v. National Benefit Life Insurance Co.*, 1988 OK 41, 772 P.2d 383; *Cooper v. National Union Fire Ins.,* 1996 OK CIV APP 52, 921 P.2d 1297. In the absence of "oppression, fraud or malice, actual or presumed," punitive damages cannot be submitted to the jury. 23 O.S. § 9(A). Plaintiff can present absolutely no evidence that Provident acted with oppression, fraud or malice to justify submission of punitive damages to the jury.

## CONCLUSION

For the reasons set forth herein, Defendant is entitled to summary judgment on all of Plaintiff's claims.

38

Respectfully Submitted,

*s/Matthew C. Kane*
PHILLIP G. WHALEY, OBA No. 13371
MATTHEW C. KANE, OBA No. 19502
RYAN WHALEY
400 North Walnut Avenue
Oklahoma City, OK  73104
Telephone:    (405) 239-6040
Facsimile:     (405) 239-6766
pwhaley@ryanwhaley.com
mkane@ryanwhaley.com

ATTORNEYS FOR DEFENDANT
PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of May, 2022, I electronically transmitted the attached document to the Clerk of Court using the Electronic Case Filing System for filing. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to the following:

Steven S. Mansell
Mark A. Engel
Kenneth G. Cole

*s/Matthew C. Kane*
MATTHEW C. KANE