IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

RICHARD R. MORGAN,                     )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )    Case No. CIV-20-180-D
                                        )
PROVIDENT LIFE AND ACCIDENT            )
INSURANCE COMPANY,                      )
                                        )
                    Defendant.          )

**O R D E R**

Before the Court are Defendant's Motion for Summary Judgment [Doc. No. 57] and

Plaintiff's Motion for Partial Summary Judgment [Doc. No. 58] under Fed. R. Civ. P. 56.

Plaintiff seeks summary judgment in his favor on an insurance coverage issue that underlies

the parties' dispute.   Defendant seeks summary judgment on all claims.   The Motions are

fully briefed and ripe for decision.[1]

**Factual and Procedural Background**

Plaintiff brings this diversity action to recover damages for breach of an insurance

contract, breach of an insurer's duty of good faith and fair dealing, and fraud related to a

disability income policy issued by Defendant.   Plaintiff is a medical doctor who resides

and practices medicine in Oklahoma.   The parties agree that Oklahoma law applies.

---

[1]   Each party has filed a response to the opponent's motion and a reply brief in support of
its own motion.   *See* Pl.'s Resp. Br. [Doc. No. 62]; Def.'s Resp. Br. [Doc. No. 61]; Pl.'s Reply
Br. [Doc. No. 66]; Def.'s Reply Br. [Doc. No. 67].   The Court also authorized supplemental briefs
regarding Defendant's Motion.   *See* Pl.'s Suppl. Resp. [Doc. No. 80]; Def.'s Suppl. Reply [Doc.
No. 81].

Plaintiff's operative pleading is the Second Amended Complaint [Doc. No. 29].   It concerns a disability income insurance policy that Plaintiff purchased from Defendant in 1987.   *See id.*, Ex. 1 [Doc. No. 29-1] (hereafter, "Policy").[2]   Defendant allegedly markets this type of policy to physicians to provide disability coverage for an occupation in a recognized medical specialty.   Plaintiff alleges that he worked from 1987 until 2019 as both a specialist in emergency medicine and a clinician in a non-specialty practice.   In March 2019, Plaintiff suffered a heart attack that allegedly caused him to be permanently disabled from his specialty occupation as an emergency room physician.

Plaintiff's illness and loss of income from his specialty occupation allegedly entitles him to benefits under the "Residual Disability" provision of the Policy.   *See* 2d Am. Compl. ¶¶ 9, 21; Policy at 10-13 (ECF page numbering).[3]   In November 2019, Defendant approved Plaintiff's loss claim and authorized a payment of benefits, but in January 2020, Defendant denied further coverage.   Plaintiff claims that the denial was contrary to the Residual Disability provision and caused him to lose monthly payments for his lifetime. Plaintiff also claims that Defendant breached provisions of the Policy that entitled him to a waiver of premiums during a period of disability and that Defendant underpaid his benefit due to an incorrect date of commencement and an incorrect computation of the payment amount.   *See* 2d Am. Compl. ¶ 13.   In these three respects, Plaintiff claims that Defendant

---

[2]   The record contains numerous copies of the Policy, including Exhibit 1 to Plaintiff's Motion [Doc. No. 58-1] and part of Exhibit 3 to Defendant's Motion [Doc. No. 57-3] (pp. 45-80).

[3]   All spot citations to the Policy use page numbers assigned by the electronic case filing system.

"breached the insurance contract by failing and refusing to properly and promptly pay covered policy benefits to Plaintiff."  *Id*. ¶ 15.

Plaintiff also claims that Defendant acted in bad faith in the denial of his claim for Residual Disability benefits.  Plaintiff pleads facts in support of his bad faith claim that tend to show Defendant discontinued benefit payments for reasons unrelated to Plaintiff's right to coverage under the Policy and without regard to the applicable provision, failed to properly evaluate the medical evidence and adequately investigate his claim, and refused to pay benefits to which he was entitled under the terms of the Policy in a manner that unreasonably delayed, and attempted to conceal the true reasons for, Defendant's decision.

Finally, Plaintiff asserts a claim of fraud based on allegations that Defendant's soliciting agent, Earl Chambers, misrepresented in June 1987 the coverage provided by the Policy for a physician working in a medical specialty who became disabled from the specialty occupation but continued to practice.  Plaintiff alleges Defendant "knew, and intentionally omitted, the fact that . . . physicians would not be entitled to the total disability benefit of the policy in the event that the physician became disabled from his [specialty] occupation at a time when he was already engaged in another [non-specialty] occupation." *See* 2d Am. Compl. ¶ 48.   Mr. Chambers allegedly failed to disclose that the Policy would not provide total disability coverage under the circumstances of Plaintiff's plan to have a dual occupation, that is, working throughout his career in "his recognized specialty as an E.R. physician" and "a second job most of those same years with a physician team doing clinical work."  *Id*. ¶¶ 51-52.   In ruling on a motion to dismiss, the Court found that Plaintiff's allegations state a plausible fraud claim.   *See* 3/26/21 Order [Doc. No. 12].

3

Following ample time for discovery, both parties now move for summary judgment on certain issues or claims.   Both Plaintiff and Defendant seek a determination in their favor of the proper interpretation and application of the Residual Disability provision of the Policy under the facts shown by the summary judgment record.   Defendant seeks summary judgment on Plaintiff's contract, bad faith, and fraud claims.

## Standard of Decision

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A material fact is one that "might affect the outcome of the suit under the governing law."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for either party."   *Id*. at 255.   All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party.   *Id*.   "Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party."   *Banner Bank v. First Am. Title Ins. Co*., 916 F.3d 1323, 1326 (10th Cir. 2019).

The movant bears the burden of demonstrating the absence of a dispute of material fact warranting summary judgment.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial.   *See Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).   "To accomplish this,

the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see* Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see Adler*, 144 F.3d at 672. If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *See Celotex Corp.*, 477 U.S. at 322. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## Statement of Undisputed Facts

The parties agree on many relevant facts related to Plaintiff's insurance claims.[4] Defendant issued the Policy to Plaintiff effective July 17, 1987, and renewed it annually in subsequent years. Plaintiff continually paid annual premiums to maintain coverage. In 1990, Defendant amended the Policy to provide "important coverage improvements," including enhanced Residual Disability coverage. *See* Pl.'s Mot. Summ. J., Ex. 2 [Doc. No. 58-2] (hereafter, "Amendment"). In 2001, Plaintiff applied for and received increased levels of coverage under the Policy, raising the monthly benefit for total disability to higher amounts of $6,400 in May 2001 and $10,200 in October 2001.

The Policy provides that "[Defendant] will pay benefits for covered loss resulting from Injuries or Sickness subject to all of the provisions of this policy." *See* Policy at 1.

---

[4] The facts regarding Plaintiff's fraud claim are largely disputed, as discussed *infra*.

"Injuries means accidental bodily injuries occurring while your policy is in force." *Id.* at 6. "Sickness means sickness or disease which is first manifested while your policy is in force." *Id.* As pertinent here, the Policy provides for payment of Residual Disability benefits –according to a formula for calculating a monthly benefit based on a loss of monthly income – in the following provision:

> [Defendant] will pay Residual Disability Benefits as follows:
>
> 1.   Benefits start the day of Residual Disability following the [180-day] Elimination Period or, if later, after the end of compensable Total Disability during the same period of disability.
>
> 2.   Benefits will continue while you are residually disabled during a period of disability but the combined period for which benefits for Total and Residual Disability are payable can not exceed the Maximum Benefit Period for Residual Disability.
>
> 3.   The first six monthly payments for Residual Disability will be the greater of:
>      a.   50% of the Monthly Benefit for Total Disability; or
>      b.   the Residual Disability Monthly Benefit for each month.

Policy at 11, Amendment at 5.[5]   As defined by the Policy after the Amendment:

> Residual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:
>
> 1.   you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;

---

[5]   The Amendment removed an "age 65 cap" in the Residual Disability provision of the Policy "so that benefits for residual benefits may now be payable beyond your 65th birthday." *See* Amendment at 5.   A separate provision was added to set maximum benefit periods depending on the insured's age at the onset of the injury or sickness.   *Id.* at 2.

> 2.     you have a Loss of Monthly Income in your occupation of at
>        least 20%; and
>
> 3.     you are receiving care by a Physician which is appropriate for
>        the condition causing the disability.

After the Elimination Period has been satisfied, you are no longer required
to have a loss of duties or time.   Residual Disability or residually disabled
then means that as a result of the same Injuries or Sickness:

> 1.     You have a Loss of Monthly Income in your occupation of at
>        least 20%; and
>
> 2.     You are receiving care by a Physician which is appropriate for
>        the condition causing the loss of Monthly Income.

After satisfaction of the elimination period (where you are no longer required
to have a loss of time or duties), reference to a "disability" has been removed
and "Loss of Monthly Income" has been substituted to clarify our intent that
a continuing loss of time or duties is not required beyond the elimination
period.

Policy at 10; Amendment at 5.[6]

Plaintiff had a myocardial infarction (heart attack) on March 17, 2019, for which he

was hospitalized and treated by a cardiologist, Dr. William Collazo, M.D.   There is no

question that Plaintiff experienced a "Residual Disability" due to this injury or sickness.

Defendant approved Plaintiff's loss claim in a letter dated November 21, 2019, stating that

Plaintiff had Total Disability coverage beginning March 17, 2019, and Residual Disability

---

[6]   The 1990 Amendment "liberalized" the requirement "to be under the care of a Physician
in order to qualify for disability benefits" – for both Total Disability and Residual Disability – by
adding the following statement at the end of the applicable provision:   "We will waive this
requirement when continued care would be of no benefit to you."   *See* Amendment at 3.

coverage after he returned to work on March 25, 2019.[7]  Necessarily then, Defendant

determined that Plaintiff was residually disabled as defined by the Policy – meaning that

due to his injury or sickness, Plaintiff was unable to do his substantial and material daily

business duties (or could not do them for as much time as it would ordinarily take him), he

had a 20% or more loss of monthly income in his occupation, and he was receiving care

by a physician that was appropriate for the condition causing the disability.   Specifically,

as to the first requirement, Defendant determined Plaintiff was "unable to perform the

material and substantial duties of [his] occupation as an Emergency Physician due to [his]

medical condition of old myocardial infarction and ischemic cardiomyopathy."  *See* Pl.'s

Mot., Ex. 3 [Doc. No. 58-3] at 2.   Defendant cited a physician's statement completed by

Dr. Collazo dated May 1, 2019, that Plaintiff's restrictions were to "discontinue physical

exertion due to chest pain, back pain, and shortness of breath."  *Id*.   Defendant noted that

Dr. Collazo's statement "also mentions behavioral health restrictions of limiting emotional

stress" and gave a duration of "these restrictions and limitations for lifetime."  *Id*.

    As to the loss of income requirement, Defendant notified Plaintiff in the letter that

based on financial information showing a loss of earnings greater than 20% beginning in

April 2019, his elimination period was satisfied on October 1, 2019.   A disability payment

for the period of October 1, 2019, to October 13, 2019, was calculated.   Necessarily then,

Defendant determined that Plaintiff's loss of income during this period was a result of his

---

[7]   The letter addressed both Plaintiff's claim under the Policy with Defendant and his claim
for long-term disability benefits under a policy with Unum Life Insurance Company of America
provided by his employer.

injury or sickness from the March 2019 heart attack or heart condition.   However, Defendant stated that disability benefits were approved only to October 21, 2019, which was the date of Plaintiff's most recent office visit, pending Dr. Collazo's response to a request for additional information.   The letter stated:   "Our physician, board certified in Internal Medicine, has reached out to Dr. Collazo to verify and discuss support for restrictions and limitations beyond October 21, 2019."   *Id.*[8]

The significance of October 21, 2019, was Dr. Collazo treated Plaintiff that day and generated a report that led Defendant to question whether Plaintiff's cardiac condition had improved to a point of non-disability.   Defendant undertook an investigation in which it gathered additional medical information and employed consulting physicians to review Plaintiff's medical records, Dr. Collazo's response to a questionnaire, and information submitted by Plaintiff.   A summary of this investigation appears in a letter from Unum to Plaintiff dated January 24, 2020.   *See* Pl.'s Mot. Partial Summ. J., Ex. 5 [Doc. No. 58-5].

Briefly stated, Dr. Collazo's treatment records indicated as of August 2019 no restrictions or limitations of Plaintiff's activities other than to "minimize work stress as compared to activity prior to [his] myocardial infarction."   *Id.* at 3.   Specifically, Dr. Collazo recommended that Plaintiff "should curtail his more stressful ER practice and maintain an office practice."   *Id.*   In the October 21, 2019 office visit, Plaintiff reported walking two to four miles per day.   The only record of an exertional limitation was

---

[8]   Pending the receipt of this information, no decision was made regarding Plaintiff's long-term disability claim.   The letter identified "the following unresolved issue(s):   Validation of [Plaintiff's] ongoing restrictions and limitations from October 21, 2019 to the present."   *Id.*

Plaintiff's self-report of experiencing "intermittent angina responsive to sublingual nitrates" or nitroglycerin.  *Id.*  Plaintiff had undergone a stress test that he self-limited and that did not show demonstrable ischemia.  Defendant's physicians concluded the medical evidence did not show "a severely limiting condition."  *Id.*  Defendant concluded after reviewing the information that neither Dr. Collazo nor Plaintiff provided "information that intermittent angina . . . either is significant enough to restrict [Plaintiff's] ability to practice medicine in any capacity or that these complaints would affect [him] significantly in an emergency department practice but not in an internal medicine practice."  *Id.* at 4.

Defendant also referred Plaintiff's file for a second review by a consulting physician certified in internal medicine and cardiovascular disease.  As stated by Defendant:

> This physician stated medical information does not provide medical evidence to support restrictions and limitations.  There is no evidence of myocardial ischemia by additional testing, and [Plaintiff does] not have unstable or intractable angina and his chest discomfort stops with stopping exertion and is relieved by rest or nitroglycerin (8 in 8 months).  Our second physician also noted there is no behavioral health evaluation regarding mental stress preclusive of occupational activities.  Based on his review, our second physician agreed with the conclusion of our first physician that [Plaintiff's] ongoing restrictions and limitations were not supported.

*Id.* at 4.  Finally, Defendant relied on information from Dr. Collazo's office that Plaintiff had no office visits from October 2019 to January 2020 and the appointment scheduled for January 22, 2020, "was for a routine office visit with no testing planned."  *Id.*

As stated in the January 24, 2020 letter, Defendant determined Plaintiff's period of Residual Disability (and long-term disability under the group policy) ended October 21, 2019, because Plaintiff was "able to perform the duties of [his] occupation and [his] restrictions and limitations are not supported after October 21, 2019."  *Id.* at 2.  Plaintiff

was informed:  "Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation and your Long Term Disability claim and Individual Disability claim have been closed effective January 24, 2020."  *Id.* at 4.[9]

## Discussion

### I.   Residual Disability Coverage

The coverage question before the Court is whether Plaintiff continued to meet the criteria for Residual Disability payments when Defendant terminated his benefits.  A resolution of this question requires a determination of which party correctly interprets the applicable Policy provisions.  Plaintiff contends he is entitled to summary judgment on the coverage issue because the definition of Residual Disability is satisfied as a matter of law where, after the elimination period, he continued to experience a loss of monthly income from his emergency room (ER) job as a result of his same injury or sickness. Plaintiff asserts that under the plain language of the Policy he was not required at that point to show medical restrictions impacting his ability to perform his job duties.  Defendant asserts it is entitled to summary judgment because Plaintiff has not established that he was disabled after October 21, 2019, or that he had a loss of monthly income caused by a disability (as opposed to a voluntary cessation of ER work).

Under well-settled Oklahoma law, insurance policies are contracts to be interpreted as a matter of law if they are unambiguous.  *BP Am., Inc. v. State Auto Prop. & Cas. Ins.*

---

[9]  The letter quoted a definition of disability in the group policy requiring that Plaintiff was "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury" and he had "a 20% or more loss" in monthly earnings.  *Id.*

*Co.*, 2005 OK 65, ¶ 6, 148 P.3d 832, 835; *see Pitco Prod. Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 12, 63 P.3d 541, 545 (interpretation of unambiguous contract is a matter of law for the court).   Whether an insurance policy is ambiguous is also a matter of law for the Court.   *See Am. Econ. Ins. Co. v. Bogdahn*, 2004 OK 9, ¶ 11, 89 P.3d 1051, 1054.

The determination of whether a contract is ambiguous is made only after applying the pertinent rules of construction.   *See Dodson v. St. Paul Ins. Co.*, 1991 OK 24, ¶ 12, 812 P.2d 372, 376-77; *State ex rel. Comm'rs of Land Office v. Butler*, 1987 OK 123, ¶ 9, 753 P.2d 1334, 1336-37.   The Oklahoma statutory rules of construction establish that: the language of a contract governs its interpretation, if the language is clear and explicit and does not involve an absurdity (Okla. Stat. tit. 15, §§ 154, 155); a contract is to be taken as a whole, giving effect to every part if reasonably practicable, each clause helping to interpret the others (*id*. § 157); a contract must receive such an interpretation as will make it operative, definite, reasonable, and capable of being carried into effect (*id*. § 159); words of a contract are to be given their ordinary and popular meaning (*id*. § 160); and a contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates (*id*. § 163).   "The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous.   A contract is ambiguous if it is reasonably susceptible to at least two different constructions."   *Pitco*, 2003 OK 5, ¶ 14, 63 P.3d at 545-56.[10]

---

[10]   Neither party in this case identifies an ambiguity in the pertinent provisions of the Policy.

As explained below, applying these rules of construction to the Policy leads the Court to conclude that the Residual Disability provision is unambiguous, that Defendant incorrectly applied it, and that Plaintiff continued to satisfy the definition of Residual Disability after October 21, 2019, under the undisputed facts.   Because Plaintiff remained residually disabled after that date, Defendant breached the Policy by terminating Plaintiff's coverage for his loss of monthly income from his injury or sickness.[11]

### A.   "Residual Disability" Coverage Does Not Require Plaintiff to Show Functional Limitations After the Elimination Period

Defendant asserts that Plaintiff cannot establish his entitlement to "Residual Disability" coverage after he recovered from his heart attack and his medical condition improved because the only ongoing restriction identified by his treating physician, which allegedly prevented Plaintiff from returning to his ER practice, was to avoid stress. Defendant contends this restriction was not supported by the medical evidence and, as to the ER job, "Plaintiff failed to provide any evidence of how he was negatively affected by stress as an emergency room physician."   *See* Def.'s Mot. Summ. J. at 34.   Defendant's position is that Plaintiff must show that a limitation or restriction arising from his medical condition impacted his ability – that is, his functional capacity – to perform his occupation. *See* Def.'s Resp. Br. at 15-17.   According to Plaintiff, this type of requirement no longer applies after the elimination period, when the Residual Disability definition removes a requirement to show that he was unable to do his substantial and material business duties

---

[11]   Plaintiff does not request a determination –and the Court cannot decide on the existing record – whether Plaintiff was entitled to Residual Disability benefits for the maximum benefit period, which would extend until his 65th birthday.   *See* Amendment at 2.

or do his usual duties for as long as they would normally take.   Plaintiff asserts that Defendant fails to recognize, and failed to correctly apply, the post-elimination period definition of Residual Disability to his claim.

Defendant concedes that, to establish Residual Disability after the elimination period, Plaintiff did not need to show his injury or sickness impaired the performance of his substantial or material job duties.   However, Defendant asserts that the Policy still required Plaintiff to show the existence of a disabling condition – that is, a disability – and a causal connection between the condition and his loss of income from an occupation.   *See* Def.'s Resp. Br. at 17-20; Def.'s Mot. Summ. J. at 35.   To reach its position, Defendant argues that the Policy cannot possibly mean what Plaintiff suggests because the term "disability" necessarily connotes a functional limitation and no insurer would agree to pay benefits without proof of a disability.   *See* Def.'s Resp. Br. at 13-14 & n.3.   Defendant points to causal requirements of the Policy, discussed *infra*, and a general understanding of "disability" based on various uses of the term throughout the Policy.   For example, Defendant argues that naming the Policy a "disability income policy" necessarily means it was intended to provide income lost due to a disability.   *See id*. at 19.

The Court rejects Defendant's reading of the Residual Disability provision of the Policy to require that Plaintiff establish his March 2019 injury or sickness continued to impair his functional capacity to perform his occupation after the elimination period was satisfied.   Defendant's arguments discount the significance of the enhanced definition of Residual Disability that was added to the Policy in 1990.   The Amendment removed references to "disability" from the part of the definition that applies after the elimination

period and substituted "Loss of Monthly Income" in place of "disability."   The express purpose of this change was "to clarify [Defendant's] intent that a continuing loss of time or duties is not required beyond the elimination period."   *See* Amendment at 5. Defendant's insistence that Plaintiff must continue to show a functional impairment affecting his occupation cannot be squared with this aspect of the Residual Disability provision.   *See Dodson*, 1991 OK 24, ¶ 11, 812 P.2d at 376 (insurance contract must be construed "so as to give reasonable effect to all of its provisions").   Instead, a continuing effect from the disabling event or condition is satisfied through other criteria, namely, 1) a loss of income in the insured's occupation as a result of the same injury or sickness and 2) continuing to receive care by a physician for the condition causing the loss of income.[12]

**B.    "Residual Disability" Coverage Requires a Causal Connection Between Plaintiff's Injury or Sickness and His Loss of Monthly Income**

Although establishing Residual Disability after the elimination period does not require showing a functional impairment, the Policy does require that "as a result of the same Injuries or Sickness" the insured "have a Loss of Monthly Income in [his] occupation of at least 20%."   *See* Amendment at 5.   Also, a "Loss of Monthly Income" is defined to require that it "must be caused by the Residual Disability for which claim is made."   *See* Policy at 10.   Clearly then, Plaintiff is required to show a causal connection between his March 2019 injury or sickness and his continued loss of work income.

---

[12]   Defendant points to the inclusion of an appropriate care requirement in the definition of Residual Disability to signify that Plaintiff must show the continued existence of a disabling condition.   *See* Def.'s Resp. Br. at 22-28.   But there is no evidence that this requirement impacted Defendant's coverage decision because the decision was made while Plaintiff was still being treated by Dr. Collazo.

Defendant seems to argue that a causal relationship between Plaintiff's medical condition and his income loss was destroyed if he no longer had a disabling condition – that is, Plaintiff's voluntary decision not to return to ER work after his medical condition improved was the proximate cause of his continuing income loss.   Defendant offers no legal support for this argument.

Oklahoma insurance law follows the "efficient proximate cause" doctrine, unless the terms of a particular insurance policy adopt a different rule.  *See Duensing v. State Farm Fire & Cas. Co.*, 2006 OK CIV APP 15, ¶ 17, 131 P.3d 127, 133-34.  Under this doctrine, "when concurring causes of the damage appear, the proximate cause is the dominant or efficient one that sets the other causes in operation; incidental causes are not proximate though they may be nearer in time and place to the loss."  *Shirey v. Tri-State Ins. Co.*, 1954 OK 214, ¶ 0, 274 P.2d 386 (syllabus by the Court).  Assuming there were concurrent causes of Plaintiff's income loss, the Court is not persuaded that any voluntary decision by Plaintiff to forego ER work was more than an incidental cause of his loss of employment income.

The summary record shows that Defendant determined Plaintiff's disabling medical condition was his "old myocardial infarction and ischemic cardiomyopathy."  *See* Pl.'s Mot., Ex. 3 [Doc. No. 58-3] at 2.  In treating this condition, Dr. Collazo recommended that Plaintiff should make a permanent lifestyle change by discontinuing a work schedule in which he regularly performed two occupations – specifically, stopping the occupation that was more stressful or demanding (the ER job).  Defendant concedes that patients with cardiac conditions may receive recommendations for lifestyle changes to improve overall

16

health, which may include exercise, sleep habits, special diet, or weight loss.  *See* Def.'s Mot. Summ. J. at 32.   Plaintiff's treating physician identified a change that could produce a better outcome for Plaintiff, that is, decreasing a heavy workload from having two jobs. There is no question that this change caused a loss of work income, and no facts suggest a separate cause.   There is no evidence, for example, that Plaintiff experienced any other injury or sickness or any intervening cause decreased Plaintiff's work income.

In summary, Defendant's incorrect reading of the Policy impacted its investigation and resolution of Plaintiff's Residual Disability claim.   The reviewing doctors were asked to evaluate whether Plaintiff had limitations or restrictions from his medical condition that continued to impair his functional capacity to perform his occupation.   This was not the proper question under the Residual Disability provision after the elimination period ended. On the present record, it is undisputed that the loss of income was a result of Plaintiff's discontinuation of his ER job and this change of occupation was a result of his treating physician's advice to discontinue working two jobs and, specifically, to discontinue the more stressful one.   Accordingly, Plaintiff was entitled to Residual Disability coverage at the time Defendant terminated his payments.

For these reasons, the Court finds that Defendant breached the Policy by denying Residual Disability benefits to Plaintiff after October 21, 2019.

## II.    **Bad Faith**

To establish a breach of Defendant's duty of good faith and fair dealing with its insured, Plaintiff must show that Defendant breached the insurance contract and, in so doing, acted in a manner constituting bad faith.   *See Brown v. Patel*, 2007 OK 16, ¶ 9,

157 P.3d 117, 121.    To prevail on his bad faith claim, Plaintiff must prove:    1) Defendant was required under the Policy to pay his Residual Disability claim; 2) Defendant's refusal to pay the claim was unreasonable under the circumstances because Defendant had no reasonable basis to refuse, did not perform a proper investigation, or did not properly evaluate the results of the investigation; 3) Defendant did not deal fairly and in good faith with Plaintiff; and 4) Defendant's bad faith conduct was the direct cause of Plaintiff's alleged injury.    *See Duensing v. State Farm Fire & Cas. Co.*, 2006 OK CIV APP 15, ¶ 39, 131 P.3d 127, 138*; see also Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 25, 121 P.3d 1080, 1093 (per curiam) (listing essential elements).    Defendant asserts that, regardless of whether Plaintiff was entitled to further payments, the record shows Defendant "made a wholly reasonable determination based on a thorough and complete investigation" and did not act in bad faith.    *See* Def.'s Mot. Summ. J. at 38.

Upon consideration of facts supported by the record and viewed most favorably to Plaintiff, as required by Rule 56, the Court finds that Plaintiff has demonstrated the existence of a genuine dispute of material facts that prevents summary judgment on his bad faith claim.    Defendant addresses only Plaintiff's allegation that Defendant and its medical consultants wrongly ignored his stress-based disability claim.    However, Plaintiff also alleges, and presents properly supported facts to show, that Defendant pursued a global approach to two separate claims under different policy provisions and, as a result, processed his claim under the Policy in a manner that applied an inconsistent disability requirement and ignored critical differences with the Residual Disability provision. Defendant has persisted in that approach throughout this case, and refuses to acknowledge

a distinction between the two policies.    A reasonable jury could find that Defendant has not dealt fairly and in good faith toward Plaintiff and his claim under the Policy. Therefore, Defendant is not entitled to summary judgment on Plaintiff's bad faith claim.

### III.    Fraud

Defendant seeks summary judgment on Plaintiff's fraud claim based on an alleged lack of evidence to establish all essential elements of fraudulent misrepresentation. Defendant asserts:   1) "Plaintiff cannot establish that Mr. Chambers made a material statement;" 2) "Plaintiff cannot provide evidence that Mr. Chambers made a false statement;" 3) Plaintiff cannot show "Mr. Chambers knew that [the] purported statement was false, or that it was made recklessly without any knowledge of the truth;" and 4) Plaintiff cannot prove "he acted in reliance on Mr. Chambers' purported statement" or any reliance was justifiable.   *See* Def.'s Mot. Summ. J. at 23, 24, 25, 26.[13]   Defendant identifies the "purported statement" to be that the Policy would provide total disability coverage for Plaintiff's "emergency room specialty regardless of whether he worked a second job."   *Id*. at 25.

Although Plaintiff does not disagree with this characterization, the focus of his argument – and what the Court found to be a plausible claim in its Rule 12(b)(6) ruling – is that Mr. Chambers made a material omission in representing to Plaintiff that the Policy

---

[13]    Defendant also makes a conclusory assertion that "Plaintiff cannot establish that Mr. Chambers was acting as Provident's agent when Plaintiff obtained the IDI Policy."   *See* Def.'s Mot. Summ. J. at 23.   Plaintiff points out this argument ignores the fact that Mr. Chambers completed and signed the 1987 application for Defendant's Policy as the soliciting agent, and Oklahoma Insurance Department records show Mr. Chambers was an appointed agent for Defendant during the relevant time frame.   *See* Pl.'s Resp. Br., Ex. 15 [Doc. No. 62-15].

would cover a total disability from his specialty practice regardless of whether he continued to work. *See* Pl.'s Resp. Br. at 24, 27, 31, 34-35, and 41-42. Mr. Chambers' alleged sales pitch accurately described total disability coverage for a physician who limited his practice to a recognized specialty, but was not true for a physician with both a specialty practice and a non-specialty one. As interpreted by the Court, the Policy did not provide total disability coverage for a physician practicing in a recognized specialty if the physician had two occupations and lost the ability to perform only one. Plaintiff asserts, supported by his own testimony, that Mr. Chambers did not disclose this limitation or explain the effect of dual occupations, even though they expressly discussed (and so Mr. Chambers knew) this was exactly what Plaintiff planned to do. *See*, *e.g.*, *id*. at 34-35 ("the truth of what occurred in the sale of the policy is made false and deceitful, <u>because</u> Dr Morgan was working, and was going to work, two (2) jobs and the agent knew it").

At bottom, Defendant's attack on this fraud theory is that Plaintiff has no proof other than his own testimony as to what he and Mr. Chambers discussed and what Mr. Chambers knew, and he cannot show that his reliance on Mr. Chambers' alleged representation or omission was justifiable. *See* Def.'s Reply Br. at 5, 8-10. Defendant relies, in part, on the heightened standard of proof under Oklahoma law requiring fraud to be established by clear and convincing evidence.[14]

---

[14] Defendant also suggests that Plaintiff's affidavit [Doc. No. 62-2] should be disregarded under the "sham" affidavit rule of *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). *See* Def.'s Reply Br. at 7. The Court does not find the statements in Plaintiff's affidavit "completely inconsistent" with or "in direct contradiction to" his deposition testimony, as argued by Defendant. *Id*. at 6-7. Thus the affidavit cannot be disregarded. *See Law Co. v. Mohawk Constr. & Supply*

The Court is not persuaded by Defendant's argument that Plaintiff's evidence is insufficient as a matter of law to establish his fraud claim.   First, the Court's role in the summary judgment process does not extend to judging the credibility of a witness or assessing what weight to give to admissible evidence.   Second, the "clear and convincing" standard requires only "a firm belief or conviction as to the truth of the allegation sought to be established."   *Sides v. John Cordes, Inc.*, 1999 OK 36, ¶ 14, 981 P.2d 301, 306 n.15.

Upon consideration of the summary judgment record in the light most favorable to Plaintiff as required by Rule 56, the Court finds that a genuine dispute of material facts prevents summary judgment on Plaintiff's fraud claim.   Plaintiff has presented minimally sufficient facts, when viewed together with all reasonable inferences in his favor, that may establish Mr. Chambers deliberately or recklessly omitted material facts from his sales pitch to Plaintiff regarding total disability coverage for a specialty practice and that Plaintiff reasonably relied on Mr. Chambers' representations in deciding to purchase and maintain the Policy.   Therefore, Defendant is not entitled to summary judgment on Plaintiff's fraud claim.

## Conclusion

For these reasons, the Court finds that the Residual Disability provision of the Policy covers Plaintiff's loss of income from his occupation after the elimination period without further proof of impaired functional capacity.

---

*Co.*, 577 F.3d 1164, 1169-70 (10th Cir. 2009); *see also Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (10th Cir. 2012).

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Doc. No. 58] is **GRANTED in part** and Defendant's Motion for Summary Judgment [Doc. No. 57] is **DENIED**, as set forth herein.

**IT IS SO ORDERED** this 30th day of March, 2023.

TIMOTHY D. DeGIUSTI
Chief United States District Judge